Rev. Carl H. KRUELLE and Mary A. Kruelle, on their own behalf and as parents and next friend of Paul Henry Kruelle, a minor, Plaintiffs,

v.

Dr. Carroll W. BIGGS, Superintendent of New Castle County School District; Dr. Kenneth C. Madden, Superintendent of Public Instruction; Mrs. Patricia C. Schramm, Secretary of the Department of Health and Social Services; Mr. Warren J. Gehrt, Superintendent of the Division of Mental Retardation; and State Board of Education, Defendants.

Civ. A. No. 79–481.

United States District Court,
D. Delaware,
Wilmington.

May 1, 1980.

Rev. Carl H. and Mrs. Mary A. Kruelle, pro se.

Edward M. McNally, of Morris, James, Hitchens & Williams, Wilmington, Del., for defendant Biggs.

Roger A. Akin, Deputy Atty. Gen., Dept. of Justice, Wilmington, Del., for defendants Madden and State Bd. of Ed.

Matthew J. Lynch, Deputy Atty. Gen., Dept. of Justice, Wilmington, Del., for defendant Schramm.

Thomas A. LaPenta, Deputy Atty. Gen., Dept. of Justice, Wilmington, Del., for defendant Gehrt.

## OPINION

STAPLETON, District Judge:

Plaintiffs, the parents of a profoundly retarded eleven year old child, bring suit on their own behalf and on behalf of their son, Paul, to challenge the adequacy of the educational plan proposed by defendant New Castle County School District ("NCCSD"). The case arises under the Education of All Handicapped Children Act, P.L. 94–142, codified at 20 U.S.C. §§ 1401 *et seq.*, which requires that States which receive federal funds under the Act provide all handicapped children with "a free appropriate public education." 20 U.S.C. § 1412(1). It is undisputed that Delaware receives funds under the Act. The question presented by this appeal is whether the educational program proposed for Paul by the NCCSD is a "free appropriate public education" within the meaning of the Act.

Paul's Individualized Education Program ("IEP") was drawn up following his enrollment at the Meadowood School, a specialized public school operated by NCCSD for handicapped children. The IEP calls for a variety of treatments, including speech therapy, occupational therapy, and physical

therapy. The parents do not dispute the appropriateness of the treatments specified in the IEP, and it is clear that the Meadowood School can provide Paul with the therapies outlined in the IEP. The parents, however, contend that Paul requires residential placement as part of his IEP, and defendants' failure to provide such placement led them to reject the IEP and request a hearing on the matter. R. 382.

In accordance with plaintiffs' request, a hearing was held on June 14, 1979 before an impartial hearing examiner pursuant to 20 U.S.C. § 1415(b)(2). Plaintiffs were represented by counsel, and received adequate notice of the hearing. Plaintiffs both testified and were cross-examined, and introduced a volume of documents in support of their claim that Paul requires residential placement. Members of the staff of the Meadowood School testified in support of the IEP, and defendant NCCSD also introduced documents to support its position. On the basis of the evidence presented, the hearing officer determined that "The proposed educational program outlined by the Meadowood School staff through its preliminary IEP appears to be appropriate for meeting [Paul's] educational needs." R. 389. The hearing officer held that a school district's obligation to provide for residential placement

> is generated out of the need to provide a unique educational setting which is beyond the scope of the school district's capacity. This is not the situation in the present case as the School District does have such a program.

R. 391.

■ Following the hearing officer's ruling, plaintiffs contacted Dr. Ashley Angert, D.O., for an evaluation of Paul. On their appeal to the State Level Review, plaintiffs wished to supplement the record of the due process hearing with the testimony of Dr. Angert and with further testimony by themselves. R. 393. The School District opposed the reopening of the record on the grounds that such testimony would be irrelevant to the question of Paul's educational needs, and that the State Administrative Manual for Exceptional Children provided for reopening the record on review only if the reviewing officer felt the original record to be inadequate. By letter of August 14, 1979, the State Level Review officer denied plaintiffs' request to hold an additional hearing, stating that she believed the record to be "more than adequate for rendering a decision." R. 399. The federal regulations governing the State level review permit the reviewing officer to exercise his or her discretion in this regard,[1] and I do not find that this exercise of discretion was such as to deprive plaintiffs of due process of law.

In her decision upholding the decision of the hearing officer, the State Level Review officer found that the "weight of the evidence supports the District's position that [it] has in the Meadowood School, a program that constitutes an appropriate educational placement for Paul Kruelle." R. 404. She noted that residential placement for Paul had never been recommended by professionals except to the extent it was needed to meet temporary and transient needs, and concluded:

> As the services of Paul Kruelle after the traditional school day are more in the nature of parenting than of education, and the evidence indicates that a 24 hour intervention program is not required at this time, the district is not obligated to support full time care and maintenance for the student.

R. 405.

The plaintiffs appealed this decision by filing a civil suit pursuant to 20 U.S.C. § 1415(e)(2).[2] That section provides that "the court shall receive the records of the administrative proceedings, shall hear addi-

---

1. 45 C.F.R. § 121a.510.

2. The original complaint named only the NCCSD as defendant. The complaint was subsequently amended to include the State Department of Public Instruction, the Division of So-

cial Services, and the Division of Mental Retardation as additional defendants. Doc. Item 8. Later the State Board of Education was added as a party defendant. Doc. Item 25.

tional evidence at the request of a party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate."

Both parties requested the opportunity to present additional evidence, and a hearing was held on January 31, 1980. The following findings of fact are based on the testimony and documents before the State hearing officer as well as the testimony and exhibits adduced at the hearing in this Court.

Paul Kruelle is a profoundly retarded child whose physical development is further complicated by cerebral palsy. At age twelve, he cannot walk, dress himself, or eat unaided. He is not toilet trained. He does not speak, and his receptive communication level is extremely low. In addition to his physical problems, he has had a history of emotional problems which result in choking and self-induced vomiting when experiencing stress.

It is undisputed that to achieve the progress of which Paul is capable, he needs a large number of specialized services including speech, physical, and occupational therapy. It is clear from the testimony of the Meadowood staff that the Meadowood School offers well-qualified and dedicated teachers in these areas who could, under some circumstances at least, be of significant help to Paul. The question, then, is not whether Meadowood is adequate for what it offers, but whether Paul requires more continuous care than that available in a six-hour school day in order to learn.

Paul has had a fairly long history of educational placements leading to emotional stress. Before moving with his family to Delaware, Paul lived in Pennsylvania where for four years he was placed in a mixed class of trainable mentally retarded students in elementary school. By the beginning of 1977, he was experiencing great difficulty holding food down and had frequent temper tantrums in and out of school. Eventually he was given in-the-home instruction due to his rejection of the school environment. R. 252.

In September of 1977 he was placed in the day program at the Gertrude A. Barber Center in Erie, Pennsylvania. This school offered the special services Paul required, and he appeared to adjust well at first. However, by the beginning of 1978 he again appeared to be emotionally upset, and his choking and vomiting behavior resumed when he was at home.[3] The problem became so severe that both the parents and the school officials concluded that twenty-four hour residential treatment was indicated. R. 204, R. 206. Paul was placed in respite care in May of 1978, and in June was moved to the Community Living Arrangement program operated by the Barber Center for multiply-handicapped children. R. 208. He remained at this twenty-four hour residence until the end of January, 1979, when his family moved to Delaware. The Community Living Arrangement was not "residential" in the sense of having the living environment on the same premises as the school facility, but it apparently did provide skilled, trained care-takers around the clock. It appears that Paul adjusted well to the combination of the Barber Center school and the CLA residence, except for a period of illness in November of 1978.

In March of 1979, after approximately one month's absence from school, Paul was placed in respite care at the home of Mrs. Pat Albanese and was enrolled in the Meadowood School. The testimony of his teachers indicated that Paul made observable progress in various areas in the two weeks he attended the school. Mrs. Albanese testified at the administrative hearing that she has worked with handicapped and retarded children in a professional capacity for ten years. Her respite home housed four or five other handicapped children during the month Paul lived there, but Mrs. Albanese was able to give Paul a fair amount of attention, especially in the areas of self-feeding, toileting, and ambulation. She

---

**3.** The record is unclear, but it appears that while in respite care during the winter months of 1977–78, his behavior improved. Virtually nothing about this respite setting appears in the record.

was familiar with Meadowood's program, and made a point of continuing Paul's daytime training in the evenings. R. 121–122. She did not observe Paul to reject food or liquid as he had done in the past. Paul did develop a cold which required medical attention, and when he was returned to his parents at the end of March, 1979, they decided not to send him to the Meadowood School any longer, feeling that it was injurious to his health. Paul has not attended any school program since that time.

According to Dr. Ashley Angert, D.O., the child psychiatrist consulted by plaintiffs following the June due process hearing, Paul's multiplicity of conditions makes him extremely vulnerable to stress associated with any significant transition. Dr. Angert's examination of Paul led him to conclude that Paul suffers from "a lack of motivation for even the basic self-help and survival skills encountered in a one-year-old child." (PX–2). He noted that some profoundly retarded children can learn in a day program, but he felt that Paul required a greater consistency of approach or program in order to benefit from training. Paul's history suggested to Dr. Angert that inconsistency of approach, environment or caretakers typically led to stress and self-destructive behaviors such as vomiting. He urged an around the clock placement "with programming by people who know how to do it" in order to maximize Paul's chances of learning, and warned that while Paul might be able emotionally to tolerate the transition from home to school, he "may not learn." Tr. 31. On the basis of this history, plaintiffs urge this Court to find that a "free appropriate public education" under the Act must include residential placement.

■ It is clear that the Act contemplates residential placement under some circumstances, and that when a residential placement is necessary for educational purposes, "the program, including non-medical care and room and board, must be at no cost to the parents of the child." 45 C.F.R. § 121a.302. Defendants argue, however, that in order to be covered by the Act the placement must be for educational pur-

poses, and they contend that the evidence indicates that Paul's educational needs can be met by the day program at the Meadowood School. They urge that Paul's need for residential placement, if such a need exists, is caused by social and emotional problems resulting from the home environment, and that inadequacies there must be met by other agencies, perhaps by a neglect proceeding against the parents.

Similar arguments were made to the District Court in *North v. District of Columbia Board of Education*, 471 F.Supp. 136 (D.D.C.1979). There, a multiply handicapped child with severe physical and emotional problems sought residential placement. Though the parties agreed that such placement was required, the defendants argued that since the problems were emotional ones, payment was the responsibility of the parents or the social service agencies, and was not available from the Board of Education under the Education of All Handicapped Children Act. In ordering payment by the Board of Education, the court wrote:

> It may be possible in some situations to ascertain and determine whether the social, emotional, medical or educational problems are dominant and to assign responsibility for placement and treatment to the agency operating in that area of that problem. In this case, all of these needs are so intimately intertwined that realistically it is not possible for the Court to perform the Solomon-like task of separating them.

471 F.Supp. at 141.

■ I come to the same conclusion here. I am persuaded by Paul's educational record that because of his combination of physical and mental handicaps, he requires a greater degree of consistency of programming than many other profoundly retarded children. The choking and vomiting which accompany stressful situations interfere with his ability to learn. Whether that problem is classified as "physical" or "emotional," and whether it results from the transition from school to home or from home to school, it is evident that Paul will realize his learning potential only if he receives more profes-

sional help than the Meadowood School's day program can offer him. His improvement during the brief period he was enrolled in that school is supportive of, rather than inconsistent with, this conclusion. During that period he participated in what amounted to a twenty-four hour coordinated program administered by trained and experienced personnel.[4]

I am aware that the policy embodied in the Education of All Handicapped Children Act encourages the placement of a handicapped child in the "least restrictive environment." *See, e. g.*, 45 C.F.R. § 121a.552. Ordinarily this policy would suggest that before placing a handicapped child in a twenty-four hour care program, attempts should be made to provide in-home, after school instruction which would allow the child to remain with his or her family. In Paul's case, however, such attempts have been made in the past, and each has occasioned regression for Paul. I do not mean to imply any criticism of the parents by this observation; as this record graphically demonstrates, the job of training a child such as Paul is an extremely difficult and frustrating one.[5] Once Paul has achieved a minimal level of self-help skills, I am hopeful that he can be returned to his family to continue his training in a non-residential facility. Certainly nothing in the record suggests that Paul's needs are static or unchanging, and the concept of a "free appropriate public education" is flexible enough to take into consideration his changing needs. In the meantime, however, it would appear that full-time care is necessary in order to allow Paul to learn.

One purpose of the Education of All Handicapped Children Act was to provide for one centralized agency in each State to assume responsibility for providing each child a free appropriate public education. 20 U.S.C. § 1412(6); 45 C.F.R. § 121a.600.

In Delaware, the General Assembly has designated the State Board of Education as the agency responsible for fulfilling the requirements of the Act. 14 Del.C. § 3120. The State Board of Education may, of course, make arrangements with other State agencies for providing a "free appropriate public education," but responsibility for coordinating these efforts and arranging full payment clearly lies with the State Board of Education. Judgment will enter against that body in favor of plaintiffs.

---

4. Paul's experience during this period may suggest that his educational needs can be met other than by a program administered in an institutional setting. That question was, of course, not before me during the trial of this case and, accordingly, I express no opinion on

it. I hold only that the educational program which the NCCSD has offered Paul is not a "free appropriate public education" within the meaning of the Act.

5. *E. g.*, R. 40, 41, 75, 79.