ADAMS CENTRAL SCHOOL DISTRICT NO. 090, ADAMS
COUNTY, AND EDUCATIONAL SERVICE UNIT NO. 9,
APPELLEES, V. MARVIN DEIST AND MYRTLE DEIST,
APPELLANTS.

334 N.W.2d 775

Filed May 13, 1983.   No. 81-773.

Jacobsen, Orr & Nelson, for appellants.

John F. Recknor of Barlow, Johnson, DeMars & Flodman, for appellees.

KRIVOSHA, C.J., BOSLAUGH, MCCOWN, WHITE, HASTINGS, and CAPORALE, JJ., and MORAN, D.J.

HASTINGS, J.

This action began as a special education hearing brought pursuant to 20 U.S.C. § 1415 (1976) and Neb. Rev. Stat. § 43-661 (Reissue 1978) before the Nebraska Department of Education. Marvin and Myrtle Deist brought this action on behalf of their son David against Adams Central School District No. 090 (Adams Central), Educational Service Unit No. 9 (ESU No. 9), and the Nebraska Department of Education (NDE), alleging that David had been denied a free appropriate public education. The NDE was dismissed as a party at the administrative level.

After a hearing was held, the hearing officer, Michael Sullivan, found that David had been denied a free appropriate public education. Sullivan ordered the appellees to provide David with a residential placement near his home, to pay for David's past placement in the Hastings Regional Center and the Nebraska Psychiatric Institute, and granted David 16 additional months of free appropriate public education as compensation for education he failed to receive in the past.

Adams Central and others appealed the hearing officer's decision to the District Court of Adams County, Nebraska, which reversed the decision of

the hearing officer. That court found David to be entitled to classroom placement without any residential care other than by his parents; that Adams Central is not liable for the costs of David's placement in the Hastings Regional Center or the Nebraska Psychiatric Institute, as such placement was voluntary and without the consent of Adams Central; and that David is not entitled to 16 months' additional free appropriate public education as compensation for education missed in the past.

The Deists have appealed, assigning several errors in the decision of the District Court. They complain that the District Court erred (1) in holding that a day educational program could provide David with free appropriate public education; (2) by failing to hold that David was unlawfully excluded from public school; (3) by not ordering residential placement for David; (4) by failing to assign primary responsibility for David's education to appellees; (5) in holding that David was voluntarily placed in the Hastings Regional Center and the Nebraska Psychiatric Institute; (6) by denying appellants reimbursement for the cost of that placement; and (7) in denying David any compensatory education.

There is no real dispute as to the facts in this case. David Deist was born July 25, 1963. His early development was fairly normal. In 1966, after David began to exhibit some antisocial behavior, the Deists had him examined by Dr. Frank Menolascino of the Meyer Children's Rehabilitation Institute in Omaha and by Dr. Michael O'Neill of the Norfolk Regional Center. At that time both of these doctors described David as autistic. Twice a week during the next 2 years David received services from the Norfolk Regional Center. When he reached the age of 6 the Deists moved to Hastings, and there David began attending school at the School for the Trainable Mentally Retarded (TMR School) and the Hastings Regional Center, one-half day each. Eventually David attended a full-day program at the TMR School.

When he was 12, in approximately 1976, he developed grand mal epilepsy. The general consensus of the experts who have examined David is that he suffers from autism or organic brain syndrome, mental retardation, and epilepsy.

In the fall of 1977 David began exhibiting increasingly destructive and disruptive behavior at school and at home. As a result of this behavior he became increasingly difficult to handle at school. On approximately December 21, 1977, David was sent home from school early. Mrs. Deist testified that a note was sent home with David stating, in short, that he could not return to school until his behavior was altered.

On December 22, 1977, the Deists met with the local school officials to discuss David's placement. Mrs. Deist testified that it was her understanding from this meeting that David would not be permitted to return to the TMR School and that there was no available suitable placement for David at that time. This was confirmed by the testimony of Don Sutton, supervisor of special education of the trainable mentally handicapped, who said that he was not surprised when David did not come back to school in December because "I think we had requested that they keep him home." He also confirmed that at the meeting with the parents they were told that David was going to have to stay home because he was just unmanageable. On December 28, 1977, unable to care for him at home, the Deists placed David in the Hastings Regional Center.

As early as January 4, 1978, Thom Pickton, a social-emotional consultant at ESU No. 9, who had worked with David, recommended: "The most appropriate or ideal placement for David at this time would be a completely structured 24-hour setting incorporating the use of applied behavioral techniques such as premacking, time-out, contingency management, etc." Pickton also observed that David's aggressive behavior had increased after an increase in

his seizure medication had been prescribed. Similar recommendations calling for a 24-hour-per-day structured program for David were also made by other ESU No. 9 staff members in the first few months of 1978, and Mr. Sutton agreed that ESU No. 9 undertook no actions on the basis of those recommendations. He also conceded that at the January 23 meeting he did have objections to David's returning to the TMR School because he did not think he was ready. No homebound instruction was given to David during the month of January because he could not find any teacher to work with him. After January 30 Mr. Sutton said that he found a friend of his to work with David, a person who at the time was working for a bakery, who was not a certified teacher of any sort but did have a degree in business. Therefore, while at the regional center David received, at best, 2 hours of educational instruction per day.

While in the regional center David deteriorated greatly, losing many of the skills he had mastered prior to his being placed there. Members of the ESU No. 9 staff, Adams Central staff, and the Deists met monthly during David's stay at the regional center to discuss his placement. No alternative placement for David was made, even though it was agreed that the regional center was not the appropriate place for David. Finally, the regional center staff, in May of 1979, informed the Deists that their only option was to move David to the state institution in Beatrice and that this would have to be done by May 10, 1979.

David's parents visited the facilities at Beatrice in April, and Mrs. Deist testified that the children's cottage facilities were nice, modern, and up-to-date, and they seemed to have an adequate staff working with the various group homes. However, when asking about arrangements to place David, they were told that there was a long waiting list, over a year's time. The only thing available, they were

told, was a locked male ward. The parents concluded that this was not a satisfactory placement for their son.

According to the evidence, the Deists were told that David could not remain at the Hastings Regional Center after May 10. At that time the Deists moved David to the Nebraska Psychiatric Institute (NPI) in Omaha. This was done as a result of joint efforts and with the support of ESU No. 9 and Adams Central, although it was the Deists who located this placement and transferred David thereto. David remained in the NPI until the time of hearing, March 10, 1980. There is no evidence in the record indicating what has happened to David since that time.

There are several substantive issues presented on this appeal. First, we must determine the appropriate standard of review in this matter. Neb. Rev. Stat. § 43-666 (Cum. Supp. 1982) provides for appeals from the decision of the hearing officer in cases such as this. It states: "Any party aggrieved by the findings, conclusions, or final decision and order of the hearing officer is entitled to judicial review under sections 84-917 to 84-919. Orders of hearing officers are enforceable in appropriate proceedings in the courts of this . ate." .

Neb. Rev. Stat. § 84-917 (Reissue 1981) provides for review of the hearing officer's decision by the District Court. Subsections 5 and 6 of that statute provide how that decision may be reviewed: "(5) The review shall be conducted by the court without a jury on the record of the agency.

"(6) The court may affirm the decision of the agency or remand the case for further proceedings; or it may reverse or modify the decision if the substantial rights of the petitioner may have been prejudiced because the agency decision is:

"(a) In violation of constitutional provisions;

"(b) In excess of the statutory authority or jurisdiction of the agency;

"(c) Made upon unlawful procedure;

"(d) Affected by other error of law;

"(e) Unsupported by competent, material, and substantial evidence in view of the entire record as made on review; or

"(f) Arbitrary or capricious."

Neb. Rev. Stat. § 84-918 (Reissue 1981) describes this review as "de novo on the record."

When interpreting these statutes we have held that only a limited review of the findings of the agency is provided for. In *The 20's, Inc. v. Nebraska Liquor Control Commission*, 190 Neb. 761, 212 N.W.2d 344 (1973), we had an opportunity to determine the meaning of "de novo" review under these statutes: "The plaintiff contends that the provisions of section 84-918, R.R.S. 1943, providing for de novo review in this court, mean that we examine the record and reach an independent conclusion without reference to the findings of the commission or those of the District Court. The commission contends that our review of its decision is governed by the criteria of section 84-917(6), R.R.S. 1943, as is the review by the District Court.

"The statute does not make clear which meaning is intended. We believe the commission's contention is essentially correct. If, for example, under criteria (6)(e) there is before the commission substantial evidence which would support a finding either way, neither the District Court nor this court should disturb the commission's finding. In such a case and where fact findings under criteria (6)(e) are involved, we review the decision of the District Court only to determine that it and the commission have applied the proper criteria, and it is in this sense that we review de novo." 190 Neb. at 764-65, 212 N.W.2d at 346-47.

Under these statutes the courts are only to give limited review to determine if the agency's decision was supported by competent evidence, if it was arbitrary or capricious, etc. The reviewing court may

not make independent findings of its own. This being the applicable standard of review in this matter, we need only determine if the hearing officer applied the proper rules of law in this case to reach a decision which is supported by competent evidence in the record.

The laws governing the educational rights of the handicapped are found in both federal and state law. The Education for All Handicapped Children Act of 1975 (the Act), 20 U.S.C. §§ 1401 et seq. (1976), represents the federal body of law, and the care and education of handicapped children is provided for in Neb. Rev. Stat. §§ 43-601 et seq. (Reissue 1978) on the state level. The Act is a funding statute under which the federal government supplies financial assistance to the states for the education of handicapped children. By accepting these funds the state implicitly agrees to meet certain criteria and requirements. See *Monahan v. State of Neb.*, 491 F. Supp. 1074 (D. Neb. 1980), *aff'd in part and rev'd in part* 645 F.2d 592 (8th Cir. 1981). In short, the Act requires each state that accepts these funds to provide all handicapped children with a free appropriate public education.

"The Act provides for funds to be distributed to the states electing to participate under its provisions. In making the election a state has to satisfy the Commissioner of Education that it 'has in effect a policy that assures all handicapped children the right to a free appropriate public education.' 20 U.S.C. § 1412." *Hines v. Pitt County Bd. of Ed.*, 497 F. Supp. 403, 405 (E.D. N.C. 1980). It is interesting to note that the court in *Hines* points out in a footnote that all states have elected to accept these federal funds except New Mexico.

Defining what a free appropriate public education is, § 1401(18) states: "The term 'free appropriate public education' means special education and related services which (A) have been provided at public expense, under public supervision and direction,

and without charge, (B) meet the standards of the State educational agency, (C) include an appropriate preschool, elementary, or secondary school education in the State involved, and (D) are provided in conformity with the individualized education program required under section 1414(a)(5) of this title.''

The specific requirements in each given case, when determining what is appropriate, will, of course, depend upon the needs and abilities of each individual involved. '' 'This standard would require that each handicapped child be given the opportunity to achieve his full potential commensurate with the opportunity provided to other children.' '' *Springdale School Dist. #50 v. Grace*, 656 F.2d 300, 304 (8th Cir. 1981).

In this case the record contains a great deal of evidence concerning what is the appropriate educational setting for David. As pointed out above, Thom Pickton and other ESU No. 9 staff members recommended a 24-hour structured environment for David when he first left the Adams Central schools. Dr. John McGee testified that he worked with David while at the NPI. Dr. McGee is the special assistant to the director of the Meyer Children's Rehabilitation Institute and project director for the Nebraska Chapter for the Society of Autism in the development of programs for autistic children and adults, and has had 12 years' experience in teaching and working with handicapped children and adults. When asked what type of educational program David would most benefit from, Dr. McGee said: ''A-. . . From my working with David and observing other people like David around the country and other programs around the country, my recommendation would be that David needs a total educational program. In other words, from the time he gets up in the morning until the time he goes to bed in the evening, during that thousand minute waking day David should be in a developmental educational structured, intensive kind of program. The way

functionally or practically I would see that working would be, number one, he should be in a highly structured classroom setting with a well trained teacher, and we've some teachers who through minimal intensive practical training pick up the skills that a person with his needs requires. So, he would be in that kind of classroom setting working on, I think, a mix of cognitive skills, academic skills, prevocational skills, self-care types of skills. And then, in conjunction with that, a concurrent educational program in an out-of-home community based, residentional [sic] facility that would work in conjunction with the classroom setting which David was in and would reinforce a lot of the things that he was involved in, so that you would end up with a total educational program. David does need structure, there's no doubt about it. David needs a type of setting where he can be involved in learning all day long. And I think if we were to do that, that across time that degree of structure he needs would decrease but at the onset we need that type of flexibility built into his program. Q- And I guess it's my understanding from what you have been saying is that the residential component of the program is an integral part of the whole educational program for David. A- No doubt about it.''

When asked if this type of environment could be provided in the home, Dr. McGee said he felt a home situation could not offer a sufficiently controlled environment to facilitate David's needs. Testimony was also taken from a Dr. Michael O'Neill. He is a certified general and clinical psychologist and is an adviser to the Nebraska Society for Autistic Children. Dr. O'Neill had worked with David at the Norfolk Regional Center. When asked his opinion as to whether a residential component would be an integral part of a structured education for David, he said: ''A- I think that a residential program would be essential to his education at this point. Q- Can you explain the reason for that feeling? A- The

kinds of learning that David needs will be very difficult to accomplish in simply a classroom setting. While it may be possible to achieve some control over his behavior and his skill level within the classroom, within the confines of the classroom, experience and research with autistic children has shown a considerable difficulty they have in generalizing to the rest of their world experience. They seem to be able to discriminate areas that they need to behave and learn and areas that it's unnecessary for them. If David is to establish any of the skills and competencies set out in the I.E.P. as a part of his general level of functioning, that will have to be on a twenty-four hour a day basis."

Finally, the testimony of Dr. Frank Menolascino was taken in deposition form. He is associate director of the Nebraska Psychiatric Institute and has been associated therewith for 20 years. He worked a great deal with David while at the NPI. Dr. Menolascino's opinion is in accord with Dr. McGee's and Dr. O'Neill's as to what David's needs are, that is, a residential, group-home type setting. The evidence recommending David be given this type of educational setting is uncontradicted by any other evidence in the record.

On the basis of this evidence the hearing officer Sullivan found "residential placement in or near this community [Hastings, Nebraska] is a necessary element of free and appropriate public education to which David Deist is entitled to under the law." This finding is permissible under the law.

"It is clear that the Act contemplates residential placement under some circumstances, and that when a residential placement is necessary for educational purposes, 'the program, including non-medical care and room and board, must be at no cost to the parents of the child.' 45 C.F.R. § 121a.302." *Kruelle v. Biggs*, 489 F. Supp. 169, 173 (D. Del. 1980). See, also, *Gladys J. v. Pearland Independent School Dist.*, 520 F. Supp. 869 (S. D. Tex.

1981).  This finding is supported by the substantial evidence set out above that was before the hearing officer.

As pointed out above, review by this court and the District Court in this case is limited.  We are only to determine if the hearing officer's decision is supported by the evidence, is proper under the applicable law, and if it is arbitrary or capricious.  We determine, on a review of the entire record, that the decision of the hearing officer granting residential placement to David Deist is permissible under the law, is supported by substantial and competent evidence, and is neither arbitrary nor capricious.  Therefore, we find that portion of the hearing officer's order which granted David residential placement was proper, and it is reinstated.

We turn now to the question of whether the Deists should be reimbursed for the costs they incurred while David was in the Hastings Regional Center and the NPI.  To answer this question we must first determine if David's removal from the Adams Central schools was voluntary, a suspension, or an expulsion.

As pointed out above, Mrs. Deist testified that on the day David was sent home in December of 1977 she had a note indicating the school would not allow him to return.  She also testified that after the meeting of December 22, 1977, with the school officials it was her impression that David could not return to school.  Mr. Don Sutton, supervisor of the school David attended, testified that he shared the belief that David could not return to school.  Mr. Sutton also testified as to a meeting held on January 23, 1978.  He said that at that time he felt David could not return to school.  On February 16, 1978, another meeting was held to consider alternatives for David.  At that time return to the TMR School was not considered as a possible alternative.  Meetings like these continued throughout 1978, at which alternatives for David's education were discussed.  His return to the

TMR School was never offered as an alternative. This evidence clearly supports the hearing officer's finding that David was expelled from the TMR School.

When a handicapped child is expelled, this constitutes a change in placement. When a change in placement occurs, the procedural protections of the federal act, §§ 1401 to 1415, are to be followed. *S-1 v. Turlington*, 635 F.2d 342 (5th Cir. 1981). These procedures were not followed in this case.

Also, local school officials are prohibited, under the federal act, from expelling students whose handicaps cause them to be disruptive. In such a case the school may only transfer the disruptive pupil to an appropriate, more restrictive environment. *Doe v. Koger*, 480 F. Supp. 225 (N.D. Ind. 1979); *Stuart v. Nappi*, 443 F. Supp. 1235 (D. Conn. 1978). In this case there is no evidence which definitely states what caused David's disruptive behavior, although there is some indication that it may have been due to the increase in the medication he was taking. The lack of such evidence does not give rise to an inference that expulsion was appropriate. Rather, the burden is on the state to produce evidence as to whether the student involved was expelled for behavior due to his handicap or not. *S-1 v. Turlington, supra.*

In light of the above authority David was not only expelled but he was expelled improperly. The question now becomes what relief, if any, may be afforded the Deists in light of this improper expulsion. The case of *Boxall v. Sequoia U. High Sch. Dist.*, 464 F. Supp. 1104 (N.D. Cal. 1979), gives some guidance. In that case Frank Boxall tried to obtain an educational placement with the local school district for his autistic son. The district informed Boxall that no program was available for his son, and denied him any placement. For 2 years after this denial Boxall paid a private tutor to work with his son. Finally, Boxall brought an action under, among other federal

statutes, the Education for All Handicapped Children Act of 1975 and the Rehabilitation Act of 1973, as did the Deists in this case. Boxall sought to secure a free appropriate public education for his son and to recover the cost of the private tutor.

Discussing whether this cost was recoverable or not, the court said: "First, the Education of the Handicapped Act again provides its own complementary remedies. As noted before, it expressly contemplates a private right of action to review the decision on what constitutes an appropriate education for a handicapped person. It is not completely clear from the wording of the statute whether it implies an action for damages. Section 615(e)(2) of the Act, 20 U.S.C. § 1415(e)(2) simply gives aggrieved individuals the right to bring a civil action. *See also* 45 C.F.R. § 121a.511. Some light is shed, however, by the available legislative history of this right to review, which was adopted initially by the Conference Committee. It was not originally part of the Senate bill, and the House provision was also somewhat different. The Committee Report indicates that no limitation on damages actions was intended. It states that: 'Such action may be brought in any State court of competent jurisdiction or in any district court of the United States and in any such action the court shall receive the records of the due process hearing (and where appropriate the records of the review of such hearings), shall hear additional evidence at the request of any party, shall make an independent decision based on the preponderance of the evidence, and *shall grant all appropriate relief.* [Emphasis added.]' Joint Explanatory Statement of the Committee of Conference, in Senate Conference Report No. 94-455, p. 50, *reprinted* in [1975] U.S. Code Cong. and Admin. News, pp. 1425, 1503. This statement suggests very strongly that, when appropriate, compensatory damages may be awarded. Since this action is under the Education of the Handicapped Act as well as the Rehabilitation Act,

the court does have the authority to award damages." *Id.* at 1112.

Viewing the legislative history of the federal act and the *Boxall* decision, it seems that compensatory relief may be appropriately granted under the Act. Such a position is in keeping with Nebraska law. See Neb. Rev. Stat. § 43-662.01 (Cum. Supp. 1982), which states that "the hearing officer shall prepare a final decision and order directing such action as may be necessary."

To determine when compensatory relief may be granted, the decision in *Doe v. Koger*, 480 F. Supp. 225 (N.D. Ind. 1979), is helpful. *Doe* presented a case where a handicapped child was expelled from school. The expulsion was appealed. One of the issues raised was whether or not the child or his parents could recover damages. That court concluded that this issue need not be reached at that time, but added in dicta that possible recovery depended upon the answer to three questions: "Whether the plaintiff is entitled to compensation depends on whether the school has caused him to lose any education. Whether the school has caused the plaintiff to lose any education depends on whether he would have been expelled even if the appropriate procedures had been followed. And whether he would have been expelled even if the appropriate procedures had been followed depends on whether his propensity to disrupt was the result of his inappropriate placement." *Id.* at 229.

In the present case the hearing officer found the school did cause David to lose education; that he would not have been expelled if the appropriate procedures had been followed; and that his propensity to disrupt was due to his placement. There is evidence in the record to support these findings. As pointed out above, David was improperly expelled from the TMR School, as the appropriate procedures under the Act were not followed. No alternative

placement was offered by the school district. This deprived David of education.

All the evidence at the hearing relevant to what placement David needs states that he needs a structural residential placement, not what he received at the TMR School. Dr. Menolascino testified that David made great strides while at the NPI in reducing or eliminating the disruptive behavior. From this the hearing officer could find that David's propensity to disrupt was the result of his inappropriate placement. If the proper procedures had been followed this inappropriate placement would have been discovered. Under the idea of "appropriate education" the answer then would have been to offer David a different placement rather than simply expel him from school.

From this evidence the hearing officer could find that the three elements from *Doe* are present in this case. Since there would be evidence present from which the hearing officer could find the test from *Doe* had been met in David's case, it would be proper for him to find that the Deists are entitled to compensation for moneys expended for David's placement.

The appellees in their brief cite the case of *Loughran v. Flanders*, 470 F. Supp. 110 (D. Conn. 1979), in support of the proposition that damages are not permissible under the Education for All Handicapped Children Act of 1975. That case was, in part, an action in tort alleging negligence on the part of the individual school board members because a child's learning disabilities were not properly diagnosed, and, as a result, that negligence has made it virtually impossible for the student to function at his full intellectual capacity. In rejecting that contention the court said: "The thrust of federal legislation in the field of special education has been to provide financial assistance to the states, in their effort to provide each one of their handicapped children with an appropriate education. Recognition of a pri-

vate remedy for damages, as alleged in this instance, would compel these programs to shift their focus. Insulation of school officials from liability would take precedence over the implementation of innovative educational reforms. Recognition of the plaintiff's claim would cause special education programs to suffer, since administrators would balk at implementing new curricula and techniques for fear of exposing themselves to liability should these innovations fail." *Id.* at 115. The case which we have under consideration does not involve innovative action; it involves inaction, and is one for reimbursement, not for general damages.

Also cited by appellees is the case of *Jaworski v. Rhode Island Bd. of Regents for Ed.*, 530 F. Supp. 60 (D. R.I. 1981), which did in fact seek reimbursement for the parents because of a failure to provide a proper placement of a handicapped child. The court relied on *Anderson v. Thompson*, 658 F.2d 1205 (7th Cir. 1981), in concluding that "the better view is that money damages are *not generally available* under the EAHCA." (Emphasis supplied.) *Id.* at 64.

*Anderson* did say that. However, the following quotation from *Anderson* is particularly applicable to the instant case: "Although we hold that the statute was not intended generally to provide a damage remedy for an incorrect placement decision, we can envision at least two exceptional circumstances in which a limited damage award might be appropriate. In those situations it is likely that Congress, though generally requiring that a child remain in his current placement, 20 U.S.C. § 615(e)(3), would have intended the parents take action to provide the necessary services for their children without awaiting the outcome of lengthy administrative and judicial proceedings. Parents should then be compensated for the costs of obtaining those services that the school district was required to provide.

"The first such circumstance was addressed in *Tatro v. Texas*, 516 F. Supp. 968 (N.D. Tex. 1981).

There a child's physical health would have been endangered had the parents not made alternative arrangements to those offered by the school system. . . . In our view, when a court subsequently determines that the services in dispute were necessary to protect the physical health of the child and also were services that should have been provided by the school district, the district court has the statutory authority to recompense parents for the costs of those services the school district failed to provide." *Id.* at 1213-14.

Although criticized by the *Jaworski* court, nevertheless *Monahan v. State of Neb.*, 491 F. Supp. 1074 (D. Neb. 1980), contained this language: "The Education of All Handicapped Children Act specifically creates a private cause of action which may be brought in federal court. In resolving such lawsuits, the Court is empowered by the Act to 'grant such relief as the court determines is appropriate.' 20 U.S.C. § 1415(e)(2). This language indicates that the Court has broad authority in granting relief under the Act. This conclusion is reinforced by the Act's legislative history, which states that 'the court . . . shall grant *all* appropriate relief.' *Joint Explanatory Statement of the Committee of Conference*, S. Rep. No. 94-455, 94th Cong., 1st Sess., at 50, *reprinted in* U.S. Code Cong. and Admin. News, at p. 1503 (1975). This language in the Act and its legislative history strongly suggest that the Court may award damages under the Act when such relief is deemed to be appropriate. *Boxall v. Sequoia Union High School District*, 464 F. Supp. 1104, 1112 (N.D. Cal. 1979). Moreover, recovery of the cost of tuition in the instant case would further the Act's purpose. This expenditure for tuition was allegedly made because of the defendant's failure to comply with the Act's procedural requirements. If these claims are proved, recovery of this cost will further the Act's purpose of ensuring that all handicapped children receive a free appropriate education. In other

words, the defendants would be required to pay the costs of Daniel's education and thus provide Daniel with a free education as the Act requires. *Compare Loughran v. Flanders, supra,* 470 F. Supp. at 115 (which held that a plaintiff could not recover damages for emotional injury or future lost earnings because such recovery would hinder fulfillment of the Act's purpose.) Thus, this Court finds that if Monahan proves his claim under the Act, an award of damages may be appropriate to compensate him for the cost of the George Norris placement." *Id.* at 1094.

We conclude that a school district, responsible for providing a "free appropriate public education" to a handicapped child, which fails to furnish adequate facilities and programs to afford such education, is liable to reimburse a parent who, in order to protect the physical and emotional health of such child, does obtain such reasonable services.

We therefore reverse the order of the District Court and reinstate that of the hearing officer regarding the reimbursement to the Deists of their cost incurred in placing David in the NPI and the Hastings Regional Center.

Turning to the issue of compensatory education, we find no support for the findings of the hearing officer in the relevant law. The Act, by its clear and unambiguous language, limits eligibility to children ages 3 to 21. § 1412(2)(B). There is no authority under this statutory scheme by which the hearing officer could grant free appropriate public educational benefits to David beyond his 21st birthday. As such, this grant was an abuse of the hearing officer's discretion. That portion of the District Court's opinion which overrules the grant of compensatory education by the hearing officer is affirmed.

AFFIRMED IN PART, AND
IN PART REVERSED.

McCOWN, J., dissenting.

Where institutional care of a child is required for

all purposes because of a physical or mental condition, I see no reason why such expenses should not be allocated between educational purposes and other purposes rather than to attribute the entire cost to education and charge it to a local school district.

Prior to the federal act and federal aid, Nebraska could and did furnish such noneducational institutional care to children and paid all the costs. Parents who were financially able to contribute to such care were required by statute to reimburse the state for a portion of such costs.

The acceptance of financial assistance from the federal government and enactment of the Nebraska special education statutes have now shifted such costs to the local school districts on the theory that residential institutional care required because of the physical or mental condition of a child and necessarily required for all purposes is actually required only for educational purposes. Such institutional care is now classified as "an appropriate public education."

The state appears to recognize some sort of duty to relieve the local school districts of some portion of the financial burden, but the federal act and regulations require that nonmedical care, and room and board incorporated as part of an appropriate educational program, must be at no cost to parents regardless of their financial ability.

The state generally excludes a right of reimbursement to school districts for residential care and allows it in specified cases only where the program has been previously approved by the State Department of Education. Parents are responsible only for medical and dental services. See Neb. Rev. Stat. §§ 43-626, 43-645, and 43-651 (Reissue 1978).

Where the physical or mental condition of a child requires residential institutional care of the child in any event and for all purposes, and is the same condition which creates a right to special education, the total cost of institutional care ought to be allocated

between educational purposes and other purposes. A rigid interpretation of the special education statutes may well be disastrous for a small local school district.