**Elliott EVANS and Katherine Evans, Next Friend and Parent of Christine Evans, Appellants,**

v.

**DISTRICT NO. 17 OF DOUGLAS COUNTY, NEBRASKA, a/k/a Millard Public Schools; and the Nebraska Department of Education, Appellees.**

No. 87–1650.

United States Court of Appeals, Eighth Circuit.

Submitted Dec. 15, 1987.

Decided March 8, 1988.

Rehearing Denied April 6, 1988.

Kelly Breen, Omaha, Neb., for appellants.

Robert M. Spire, Atty. Gen., Harold Mosher, Asst. Atty. Gen., Lincoln, Neb., for Dept. of Education.

Before LAY, Chief Judge, and HEANEY and MAGILL, Circuit Judges.

HEANEY, Circuit Judge.

Elliott and Katherine Evans, on behalf of their child Christine Evans, brought an action against Millard Public Schools in Omaha, Nebraska, and the Nebraska Department of Education under the Education for the Handicapped Act, 20 U.S.C. §§ 1400–62 (EHA). The EHA requires states to provide handicapped children a "free appropriate education" as a condition to receiving federal financial assistance. To attain this objective, the EHA establishes a system of "procedural safeguards" which permits parents to participate in, disagree with, and contest decisions made by public schools concerning their child's education. In addi-

tion, the EHA mandates that school districts meet a substantive standard of a free appropriate education.

In this suit, the Evanses claim that Millard violated both the procedural and substantive elements of the EHA. For the reasons stated below, we affirm the district court's denial of relief with one minor exception.

## FACTS

Christine Evans is ten years old and has cerebral palsy, mental retardation, and a severe behavioral impairment. She was diagnosed as being disabled in March 1978 by the Meyers Children's Rehabilitation Institute of Nebraska. She participated in physical therapy, a parent-child language program, and the Infant Stimulation Program at Meyers Institute. At the age of two and one-half, she entered a preschool program in the Millard Public Schools. She received speech, occupational, and physical therapy.

In March, 1982, Millard had a psychological evaluation performed to determine her appropriate placement after completion of preschool. Based on this evaluation and other reports, a multi-disciplinary team (consisting of Ms. Evans, a special education administrator, psychologist, physical therapist, occupational therapist, and several teachers) recommended that Christine be placed in the Trainable Mentally Retarded Program in Westside School District, a district which contracted with Millard to provide special educational services. Christine, however, did not attend during the 1982–83 school year because she moved with her parents to Florida where she attended a special education program.

The following year, the Evanses returned to Omaha and reenrolled Christine in the Millard Public Schools. In October, 1983, a multi-disciplinary team consisting of a psychologist, a speech therapist, a special education administrator, and a teacher met. From their findings, an individual education plan (IEP) was developed.[1]

---

1. The creation of an IEP is required for each handicapped child. It "sets out the child's

present educational performance, establishes annual and short term objectives for improve-

Ms. Evans participated in the preparation of the IEP and approved it. It recommended placement in the trainable program at Rockbrook School in the Westside district. This program included functional academics, behavior management, communication, gross motor/adaptive physical education, and physical and occupational therapy. Carla Ohm, with the assistance of a paraprofessional, taught the class which consisted of about eight to ten students.

Carla Ohm and Ms. Evans reviewed the 1983–84 IEP in the spring of 1984. They concluded that Christine had severe behavioral problems, but that she had made some improvements in certain academic areas. Ohm used two techniques to cope with Christine's misbehavior: "time-out" which involved placing her in an isolated setting; and "manipulation through activities" which involved physically leading Christine through tasks.

In the spring of 1984, at the request of the Evanses, Millard sent Christine to the Meyers Children's Rehabilitation Institute for reevaluation of her occupational and physical therapy. The reevaluations concluded that Christine was receiving sufficient help in those areas.[2]

A new IEP was prepared in October of 1984 by Ms. Evans, Ohm, an occupational therapist, speech pathologist, and psychologist. Ms. Evans approved the IEP. During the 1984–85 school year, however, Christine's behavior continued to pose problems. Her most severe tantrums included "headbanging and screaming." Ms. Evans told Ohm that her "home life was falling apart" due to Christine's behavior. Christine required more one-on-one assistance both in school and at home. At Ohm's request, Ken Bird, Director of Special Education for Westside, observed Christine in the classroom. He agreed with Ohm's assessment.

Ohm and Christine's mother had frequent "open and honest" conversations about Christine's behavior from December of 1984 through the spring of 1985. They discussed possible changes in Christine's placement. Ohm believed a program with stronger behavior management and with a lower pupil to teacher ratio might be necessary. Ohm told her to contact the Department of Education about a different placement. Ohm said she also told Ken Bird and Adeline Reis, Director of Special Education from Millard, about Ms. Evans's concerns.

Ohm met with Christine's mother in May, 1985, to review Christine's 1984–85 IEP. Christine's mother was given a pamphlet describing her EHA rights. Ohm told Ms. Evans that a new placement could not be considered until a multi-disciplinary meeting was held.[3] Ms. Evans understood that there would be placement changes in the fall of 1985, but she did not think there was an available program in the school system, and therefore she was considering a private placement including one out-of-state.

Ms. Evans called Ken Bird after the IEP review meeting. Bird testified that he advised her of her procedural rights and told her to talk to Adeline Reis of the Millard School District about alternative residential placements because Millard was primarily responsible for any changes in Christine's placement. Ms. Evans denies Bird told her this. Bird did, however, mention that the Evanses had to seek an in-state placement first before seeking an out-of-state one. He also testified that Ms. Evans did not object to the current placement but she stated that she and her husband might consider seeking a private placement for Christine.

Christine attended summer school at Rockbrook. Adeline Reis evaluated Chris-

---

ments in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives." *Honig v. John Doe,* —— U.S. ——, 108 S.Ct. 592, 597, 98 L.Ed.2d 686 (1988) (citing 20 U.S.C. § 1401(19)).

**2.** Ms. Evans testified that the amount of occupational therapy provided by the school had been

the primary disagreement between the Evanses and the school district.

**3.** Ohm testified that at some time in the spring, she talked to Ken Bird who agreed to look into alternative placements. Bird did not recall this. Ohm also told Ms. Evans that Bird was looking into alternative placements for Christine. Bird stated he never did this.

tine on June 13 and came to the conclusion that a change in placement needed to be made for the fall. She also testified that she placed Christine on her informal referral list for psychological reevaluations.

The district first learned in the summer or early fall of 1985 that Christine was going to be placed in a private school in the fall of 1985. Ms. Evans talked to Ken Bird in August about possible reimbursement, and she was again told to talk to Adeline Reis. The Evanses, with the assistance of Reis, eventually filed an application with the Nebraska Department of Education. This application was denied.

The Evanses filed a petition on March 24, 1986, with the Nebraska Department of Education seeking an order placing Christine in the 24–hour program at the Institute of Logopedics in Kansas and payment for past and future costs of such education and care. A hearing examiner on July 15, 1986, denied the Evanses any relief. On August 12, 1986, the Evanses filed a complaint in the district court. After a hearing on December 22, 1986, limited to the issue of whether the district had provided Christine a free appropriate public education, the district court decided against the Evanses.

ANALYSIS

A. *Procedural Compliance*

■ Section 1415 delineates the procedural safeguards in the EHA. As the Supreme Court stated in *Board of Education v. Rowley*, "the importance Congress attached to these procedural safeguards cannot be gainsaid." 458 U.S. 176, 205, 102 S.Ct. 3034, 3050, 73 L.Ed.2d 690 (1982). "Congress placed every bit as much emphasis upon compliance with procedures giving parents and guardians a large measure of participation at every stage of the administrative process * * * as it did upon the measurement of the resulting IEP against

a substantive standard." *Id.* at 205–06, 102 S.Ct. at 3050.

It is clear that in the proper case, monetary relief can be awarded for procedural violations. *McKenzie v. Smith*, 771 F.2d 1527, 1535–36 (D.C.Cir.1985) (District "largely responsible for delay in review proceedings" must pay reimbursement for private education.); *Hall by Hall v. Vance County Board of Educ.*, 774 F.2d 629, 633–34 n. 4 (4th Cir.1985) (reimbursement for private placement where procedural violations occurred). This authority stems from the "broad discretion" conferred on the courts to grant appropriate relief under section 1415(e)(2). *See School Committee of Town of Burlington v. Department of Educ.*, 471 U.S. 359, 370, 105 S.Ct. 1996, 2003, 85 L.Ed.2d 385 (1985). The Evanses contend that Millard refused to change Christine's placement upon their request and did not give them proper written notice of their refusal as required by the EHA.

1. Notice

Section 1415(b)(1)(C) requires written notice to the parents when a school district "refuses to initiate or change the identification, evaluation, or educational placement of the child or the provision of a free appropriate public education to the child." Under 34 C.F.R. § 300.505 (1987), notice includes a full explanation of the reasons for the refusal and an explanation to the parents of their rights to contest that decision.[4] The district court held that the Evanses never made a request for a change in Christine's placement and thus the notice requirements were never triggered. While the question of whether a request for change was made is a close one, we do not believe that the district court's decision was clearly erroneous.

■ In the spring of 1985, Christine's mother certainly expressed concern about

---

4. Section 300.505 states in the relevant portion: [T]he notice * * * must include:

  (1) A full explanation of all the procedural safeguards available to the parents * * *;

  (2) A description of the action proposed or refused by the agency, an explanation of why the agency proposes or refuses to take the action, and a description of any options the

agency considered and the reasons why those options were rejected;

  (3) A description of each evaluation procedure, test, record, or report the agency uses as a basis for the proposal or refusal; and

  (4) A description of any other factors which are relevant to the agency's proposal or refusal.

Christine's placement to school authorities. Carla Ohm knew that Ms. Evans wanted a change in her child's placement (including a possible private placement). Ohm also told Ms. Evans that Millard was checking into alternative placements. In her telephone call to Ken Bird, Ms. Evans indicated her dissatisfaction with Christine's placement. Without a doubt, the district knew of the Evanses' concerns, and yet it failed to apprise the Evanses fully of their alternatives. In addition, it seems that the Evanses were told that the district was exploring alternative placements when in fact it was not.

Nonetheless, we agree with the district court that the parents' expressions of concern were not enough to trigger the procedural requirements of the Act. The Evanses neither formally nor informally asked Millard to make a change in Christine's placement. Moreover, the Evanses no doubt knew the extent of their rights. On numerous occasions the school district gave them pamphlets explaining their rights. Ms. Evans testified that she knew the extent of her rights under the EHA. This case is thus distinguishable from *Hall by Hall*, 774 F.2d at 633–34 n. 4, where the parents failed to initiate proceedings because of the "school system's own failure to inform the parents of available avenues of review."

From the evidence the district court could have reasonably concluded that the Evanses decided that they wanted to place Christine in the program at Logopedics, regardless of whether Millard could provide her with a free appropriate education, either with a placement in the district or a residential placement outside the district but in the state. There is also considerable evidence that the Evanses made a decision that they did not think the district could provide the education they thought necessary for Christine.

■ While we do not believe parents must formally request a school district for a change in placement, the parents must make clear to the district that they want the school district "to initiate" the change. The Evanses never did this. We therefore

hold that the district court's finding that the Evanses did not request the school district to initiate a change in their child's placement in the spring and summer of 1985 was not clearly erroneous.

■ We do, however, find error in the district court's finding that Millard did not have a duty to abide by the procedural rules of the Act when, in the fall of 1985, the Evanses requested reimbursement for their placement of Christine in Logopedics. The district court states that "[t]here was no reason for Millard to demonstrate availability of appropriate placement in fall, 1985, because Christine was not in attendance in the district."

Christine's attendance in the district should not be dispositive of this issue. Under 34 C.F.R. § 300.403(b) (1987), even when a child is in a private placement, as Christine was at Logopedics, "[d]isagreements between a parent and a public agency regarding the availability of a program appropriate for the child, and the question of financial responsibility, are subject to the due process procedures under §§ 300.-500–300.514 of Subpart E." Under section 300.504(a), a school district must give the parents written notice of a refusal to initiate a placement. Thus, the district had to comply with the notice requirements when the Evanses made the request in the fall of 1985.

■ Because we think the facts clearly demonstrate that the Evanses received adequate notice, however, we find the error committed by the district court harmless. In September of 1985, Ms. Evans talked to Adeline Reis of Millard about paying for Christine's education at Logopedics. Reis gave Ms. Evans two pamphlets concerning EHA rights. Reis also told Ms. Evans that the state would not likely pay for the out-of-state placement. She indicated another in-state placement might be possible. Reis testified that the Evanses refused to consider a placement other than at Logopedics, and the Evanses' testimony does not indicate otherwise.

Adeline Reis gave the Evanses an application for a residential placement on Octo-

ber 22, 1985. After receiving it from the Evanses, the Nebraska Department of Education requested that Millard recommend a placement. Reis did not recommend the out-of-state placement because she believed Christine could be properly placed by Millard in the state. The State responded that because of this recommendation, it would not pay for any out-of-state residential placement.[5] The Evanses were informed of this in writing. Thus Millard gave the Evanses adequate notice under 34 C.F.R. § 300.504(a).

### 2. Evaluations and Assessments

■ The parents also have a procedural right to an independent educational evaluation performed at the school district's expense which "[m]ust be considered by the public agency in any decision made with respect to the provision of a free appropriate public education to the child." 34 C.F.R. § 300.503 (1987). The Evanses had such an evaluation performed by Dr. Henry Marks of the Institute of Logopedics on August 3 and 4, 1985. It was clear the Evanses had such an evaluation performed at Logopedics because they disagreed with the evaluations previously performed by Millard. Millard never initiated a hearing as required by section 300.505(b) to show the inappropriateness of the Logopedics evaluation, or to "show that its evaluation [was] appropriate." Therefore, the parents had a right to an "independent educational evaluation at public expense."

■ It is not true, however, that Millard violated section 300.503 by not performing a multi-disciplinary assessment or its own evaluation of Christine or by failing to develop an IEP for Christine in the 1985–86 school year. Millard only had to "consider" and, in this case, pay for the evaluations performed at Logopedics. A letter of October 22, 1985, from Adeline Reis to the Evanses clearly demonstrates that Reis had considered the Logopedics evaluations. In fact, Reis agreed that the evaluation

was "accurate" but disagreed that Christine could only be provided an appropriate placement at Logopedics.

Thus, Millard did not violate the procedures of section 300.503, although it should be required to reimburse the Evanses for the expense of the evaluation performed at Logopedics. We remand this matter to the district court for a determination of the amount of these expenses.

### 3. Failure to Provide a Reevaluation

The Evanses argue that Millard did not comply with the regulations regarding the timing of reevaluations while Christine was still in the Millard district in 1984–85. The regulations require a reevaluation of a handicapped child every three years. 34 C.F.R. § 300.534(b) (1987); see also Jose v. Ambach, 557 F.Supp. 1230, 1240 (E.D.N.Y. 1983) (triennial evaluations required). The district court found that Christine had been given an evaluation in March, 1982, and that she had not received another one at any time during the next three year period ending in March, 1985. Therefore, the district court found that the district had not complied with this regulation. The court held, however, that this violation of the EHA did not deny Christine a free and appropriate education because there was no evidence of harm to Christine's education.

■ We agree with the district court that the failure to have a reevaluation performed by March of 1985 did not harm Christine's educational progress in any way. The district court found that such an evaluation would have been performed before the fall of 1985 and that no changes in Christine's placement could have been implemented before the fall even if an evaluation had been performed earlier. In addition, as Millard points out, the evaluation performed by the Institute of Logopedics did not differ significantly from the one performed in 1982. Thus, the district court

The Evanses argue that Reis misled them by failing to tell them that the State would view Millard's opinion on the need for an out-of-state placement as dispositive. In a letter of October 22, 1985, Reis clearly informed the Evanses that

Millard would not recommend an out-of-state placement and that the State would not likely approve such a placement without the district's recommendation.

properly determined that under section 1415(e)(2) of the Act, no relief would be appropriate.

▇ This does not in any way render the force of the EHA nugatory. Parents can invoke the procedures under the Act to compel a district to perform an evaluation. A district may also be required to reimburse parents for expenses incurred as a result of the violation. Thus, school districts do have incentives to comply with this provision of the Act.

B. *Substantive Violation of the EHA*

Although the Evanses concentrate their argument on the alleged procedural violations committed by the school district and the State, they also assert that the district court erred in finding that Millard had provided Christine with a free appropriate education. Specifically, they contend that Millard should have provided a "behavior intervention plan" with "a substantial amount of one-on-one training and 24 hour consistency in the reinforcement of compliant behavior."[6]

Under the EHA, a free and appropriate education "consists of educational instruction specifically designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child 'to benefit' from the instruction." *Rowley*, 458 U.S. at 188–89, 102 S.Ct. at 3042. In confronting the question of whether a school district has provided such instruction, a court must give "due weight" to the state administrative proceedings. *Id.* at 206, 102 S.Ct. at 3051.

▇ In addition, courts must recognize that the "primary responsibility for formulating the education to be accorded a handicapped child, and for choosing the educational method most suitable to the child's needs, was left by the Act to state and local educational agencies in cooperation with the parents or guardian of the child." *Id.* at 207, 102 S.Ct. at 3051. We take this directive to mean that if a child is progressing satisfactorily with the current instructional methods, it is not our place to question whether different methods might work better.

▇ In this case, however, Christine made little or no progress under the IEP of 1984–85; indeed, she may have regressed.[7] It had become clear to nearly everyone involved in Christine's education in the spring of 1985 that changes would have to be made in her education. Carla Ohm knew this, and therefore she requested Ken Bird and Adeline Reis to observe Christine in the classroom. Adeline Reis knew this because she noted that Christine's placement would have to change in the fall.

The difficulty in this case is that in the spring of 1985 the school officials were never given the opportunity to make (or refuse to make) changes because the parents unilaterally removed their child from the school district. If indeed Christine's parents had wanted the school district to implement immediate changes in Christine's placement, they could have requested them. Millard could have begun to implement some changes immediately. Instead of demanding specific changes, the parents only discussed with the district the more drastic measure of placing their child in a private school, something which surely would take the district longer to accommodate.

▇ Thus, we do not believe it would be proper to judge whether Christine was in an appropriate placement strictly by her placement during the 1984–85 school year. A school district should be on notice of disagreements and given an opportunity to make a voluntary decision to change or alter the educational placement of a handi-

---

6. The Evanses also claim that the lack of a timely evaluation also contributed to the substantive denial of a free appropriate education. Because, as stated above, this violation did not harm Christine's educational progress, we hold that it also did not contribute to a substantive denial of a free appropriate education.

7. Christine's most prominent problem was her behavior. There is no doubt that her behavior affected her ability to learn in a significant way, and, therefore, Millard could not ignore the problem. *See Abrahamson v. Herschman,* 701 F.2d 223, 228 (1st Cir.1983).

capped child. *Cf. Adams by Adams v. Hansen,* 632 F.Supp. 858, 866 (N.D.Cal. 1985) (failure of school district to offer more appropriate placement indicates denial of free appropriate education). Only if it is likely that no change would be made which would benefit Christine (if the school district had made it clear that no change in the placement would occur), would there be a denial of a free appropriate education.

There is no indication here that Millard officials would have refused to make changes in the coming year. Most of the school officials agreed by late spring of 1985 that changes in Christine's placement were necessary. It was revealed at the hearing that a class for severely and profoundly retarded children would have provided Christine with more one-on-one attention. In addition, before the Evanses transferred Christine, the school district never ruled out the possibility that Christine could be placed in a residential school in Nebraska, and if that failed, possibly in an out-of-state school. Thus, the evidence shows no real unwillingness on the part of Millard to change Christine's placement for her betterment.[8]

■■■■ Finally, as the district court points out, the Act requires placement of a handicapped child "in the least restrictive environment." *See* 20 U.S.C. § 1412(5)(B); 34 C.F.R. § 300.552(a). In other words, children who can be mainstreamed should be mainstreamed, if not for the entire day, then for part of the day; similarly, children should be provided with an education close to their home, and residential placements should be resorted to only if these attempts fail or are plainly untenable. *See Kruelle v. Biggs,* 489 F.Supp. 169, 174 (D.Del.1980), *aff'd,* 642 F.2d 687 (3rd Cir.1981) ("[B]efore placing a handicapped child in twenty-four hour care program, attempts should be made to provide in-home, after school instruction which would allow the child to remain with his or her family."); *Hessler v. State Board of Educ.,* 700 F.2d 134, 138 (4th Cir.1983) (private educational services

resorted to when "public educational services appropriate for the child are not available."). Thus, Millard properly indicated to the Evanses that less restrictive placements would have to be thoroughly considered before the out-of-state placement at Logopedics could be.

There was no guarantee that the programs proposed by Millard would have accommodated Christine. However, the school district should have had the opportunity, and to an extent had the duty, to try these less restrictive alternatives before recommending a residential placement.

■■■■ This is not to say that parents do not have a right to place their child in a private institution and seek reimbursement for her education. They clearly have that right. *Town of Burlington,* 471 U.S. at 369, 105 S.Ct. at 2003. But, as the Supreme Court stated in *Town of Burlington,* "parents who unilaterally change their child's placement during the pendency of review proceedings without the consent of state or local school officials, do so at their own financial risk." *Id.* at 374, 105 S.Ct. at 2005. This certainly holds true for parents who unilaterally change their child's placement before those review proceedings have begun.

## CONCLUSION

We hold that the Millard Public Schools and the Nebraska Department of Education did not deny Christine Evans a free appropriate education either because of procedural or substantive violations of the EHA. We therefore affirm the district court's denial of relief except that we remand to the district court for a determination of the amount the Evanses should be reimbursed for the evaluation performed at Logopedics.

---

**8.** In addition Millard witnesses mentioned at the trial that a number of programs existed in the community which could have assisted the Evanses in educating and managing the behav-

ior of their child. It seems that the district could have supplemented Christine's placement with some of these programs at the district's expense.