**IT IS FURTHER ORDERED, ADJUDGED AND DECREED** that defendant's motion for summary judgment shall be and it is granted.

**IT IS FURTHER ORDERED** that plaintiff's motion to compel shall be and it is denied as moot.

**IT IS FURTHER ORDERED** that defendant's motion to compel shall be and it is denied as moot.

**IT IS FURTHER ORDERED** that all other pending motions shall be and they are denied as moot.

Nicholas R. PETERSEN and Alex M. Petersen, Minor Children, By and Through their parents and next friends, Daniel J. PETERSEN, and Janet J. Petersen; and Kendra E. Janssen, a Minor Child, By and Through her parents and next friends, Kevin Janssen, and Michelle Janssen, Plaintiffs,

v.

HASTINGS PUBLIC SCHOOLS, also known as School District # 0018 of Adams County, Nebraska, Defendant.

No. 4:CV92–3226.

United States District Court, District of Nebraska.

Aug. 30, 1993.

Randal B. Brown, Nebraska Advocacy Services, Inc., Lincoln, NE, for plaintiffs.

Robert W. Wagoner, Wagoner Law Offices, Grand Island, NE, for defendant.

## MEMORANDUM OF DECISION

PIESTER, United States Magistrate Judge.

In this action pursuant to the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1400, *et seq.,* the Nebraska Special Education Act, *Neb.Rev.Stat.* § 79–3301, *et seq.,* and the Americans with Disabilities Act, (ADA), 42 U.S.C. § 12131, *et seq.,* plaintiffs, three hearing-impaired children and their parents, appeal the decision of Hearing Officer Richard A. Birch rejecting, in part, their challenge to the Individualized Education Programs ("IEP's") developed for the minor plaintiffs. The parents objected to the IEP's designed for plaintiffs Nicholas, Alex and Kendra, and requested a due process hearing to determine their adequacy. The hearing officer's opinion found for plaintiffs with respect to one claim regarding the need for interpreters during the entire day rather than only during the academic periods, and for the defendant with respect to the type of signing system to be used by the interpreters.

Plaintiffs filed this action appealing the hearing officer's opinion to the extent it determined defendant's choice of a "modified" Signing Exact English sign-language system provided the minor plaintiffs with a "free appropriate public education" as required by IDEA. Plaintiffs also claim defendant's choice of the modified signing system, rather than plaintiffs' chosen strict Signing Exact English (SEE–II), violated the ADA. This court held a non-jury trial on August 16, 1993.[1] The record is supplemented by a state administrative hearing record for each minor plaintiff. For reasons stated more fully below, I shall enter judgment for the defendant.

## FINDINGS OF FACT

The parties stipulate to a number of facts. Plaintiff Nicholas R. Petersen, a minor child, was born on January 8, 1981. Nicholas has a severe to profound hearing impairment and is entitled to a "free appropriate public education" from defendant. Plaintiff Alex M. Petersen, Nicholas' brother and also a minor

---

1. The parties consented to have this action proceed before me pursuant to 28 U.S.C. § 636(c).

child, was born on September 16, 1984. Alex has a severe hearing impairment and is entitled to a "free appropriate public education" from defendant. Plaintiff Kendra E. Janssen, a minor child, was born on June 17, 1985. Kendra has severe to profound hearing impairment and is entitled to a "free appropriate public education" from defendant. Nicholas, Alex and Kendra are "qualified individuals" for purposes of the ADA. Defendant is a public entity that receives federal funding within the meaning of Title II of the ADA.

Due to the nature and extent of their disabilities, the minor plaintiffs require the services of qualified sign language interpreters in order to derive educational benefit from the special education programs and services provided them by defendant as set forth in the IEP's. Defendant has developed a "modified" SEE–II signing system for use in its school system. The evidence at trial and in the state record demonstrate that this signing system utilizes SEE–II principles and employs SEE–II signs 85% of the time. The remaining 15% employs the modifications designed by defendant to supplement the educational needs of plaintiffs. During the IEP meeting, as well as since that time, plaintiffs' parents requested defendant use a strict SEE–II signing system. The parents' request has been consistently rejected in favor of the modified system.

SEE–II is one of approximately seven signing systems enjoying widespread use in the United States. Plaintiffs' expert witness, Dr. Barbara Leutke–Stahlman, described the seven systems on a continuum with the first being most similar to the English language and the seventh being least similar. On one end of the spectrum is Oral English in which no formal signs are used. The first actual signing system is Cued Speech, which uses hand shapes and facial gestures to cue the phonemes of speech. Cued Speech is a

method of teaching a hearing-impaired person to make speaking sounds. The second system is Signing Essential English (SEE–I). This system relies on the use of signs for each morpheme of a word.[2] The third is Signing Exact English (SEE–II). SEE–II has many similarities to SEE–I, but it has its own dictionary. Further, SEE–II relies heavily on the use of "markers" or prefixes and suffixes added to the base morpheme.

The next system is "Signed/Manual English." Like SEE–II, this system has its own dictionary. However, it employs fewer markers than does SEE–II and has some signs which represent more than one morpheme. The fifth system is "Pidgin Signed English" (PSE). Dr. Leutke–Stahlman stated PSE has no written rules. This system acts as a "bridge" between the above, English-based, systems and American Signed Language (ASL), the sixth system. ASL is not English–based. Its grammar, syntax and word order differ from English and combine to form an independent language. The final system is finger-spelling, a system not relevant to this action.[3]

SEE–II is a signing system originally designed for educational purposes; it follows the English language exactly. It was designed to facilitate the development of basic English skills by accurately transmitting the precise words, in the order utilized by a speaker, to a hearing-impaired recipient. SEE–II is a popular system because of its dictionary which allows for a consistent vocabulary. As do a number of other systems, SEE–II has incorporated a number of common ASL signs. Dr. Leutke–Stahlman, although a proponent of SEE–II, stated that SEE–II is not necessarily a superior system to any of the others, depending on the particular child and family at issue. She stated that SEE–II has not caused a dramatic increase in reading levels since its creation in the early 1970's, although some studies seem

---

**2.** As described in the state hearing, a morpheme is the smallest unit of meaning in the English language. It may be a syllable, or is sometimes a portion of a word, but may also be an entire word. Thus, "boy" is a morpheme, but "boys" is two morphemes.

**3.** Like the hearing officer, I was surprised to learn not only of the number of different signing systems, but also of the degree of their incompatibility. I commend those in the "deaf education" community for their efforts to standardize these communication systems; had such efforts been taken a generation ago, perhaps this dispute would have been averted.

to indicate its potential to facilitate better understanding of English.

Defendant employs a signing system which utilizes SEE–II the majority of the time. A short list of modifications to the SEE–II system has been developed. These modifications are listed as:

(1) directionality; (2) duplicate signs to show plurals of irregular words; (3) incorporation of the number in pronouns; (4) incorporation of the number in time; (5) location of the person and things in the signing space; (6) locatives; (7) negative incorporation; (8) eye gaze and facial expression; (9) multiple meanings, especially when a concept is introduced; (10) topic comment; (11) finger spelled long signs; (12) use of some prefixes and suffixes more consistently than others; (13) use one sign for multi-sign words; and (14) all markers signed when written word is presented.

Of the listed modifications, plaintiffs' expert, Dr. Leutke–Stahlman, stated that most of the modifications were actually consistent with SEE–II principles and, thus, were not modifications at all. Her opinion was that only numbers 9, 10, 11 and 12 were modifications. She expressed uncertainty as to whether her understanding of number 10 was correct; her explanation of its meaning was contradicted by that of Peg Bayless, a deaf education specialist contracted to the district who assisted in the design and implementation of the modifications.[4]

The parties went to great lengths debating whether one particular feature of the modified system was proper. Defendant directs an interpreter to move away from strict transliteration when it appears that the hearing-impaired student does not understand the language being used. Plaintiffs allege such a policy is an improper use of an interpreter. They claim that the interpreter should transliterate the class discussion at all times and use no personal judgment as to what words are signed to the student.

During the state hearing, defendant called Dr. Brenda Schick as an expert witness. Dr. Schick is proponent of ASL and PSE as opposed to SEE–II. She stated that, while SEE–II is valuable for teaching word order, it is difficult to use for certain suffixes and auxiliary verbs. She stated that the system is difficult to sign because of the large number of signs which are used to represent each portion of the written or spoken English language. The system takes longer to sign than other systems, sometimes contains too many signs for younger students to comprehend during a conversation, and is difficult to accurately sign by interpreters.[5]

Dr. Schick testified that exposure to a number of signing systems is beneficial to hearing-impaired children because of the large number of systems they will confront when they meet other hearing-impaired persons. She stated that she knows of only one adult who consistently utilizes SEE–II, that being one of the persons who invented the system. She further disputed plaintiffs' claim that the interpreter's role is to transliterate, stating that such a practice may be improper if the student lacks a sufficient language base to understand the intent of the message.

The IEP prepared for Nicholas Petersen's May 15, 1991 IEP conference demonstrates that as a fourth grader, Nicholas was reading in Level 4, Book 4 of the Milestones Reading Series. His Stanford Achievement Test, normed for the Hearing Impaired (SAT–HI) had improved in all areas except social sciences from the previous year. A January 23, 1992 update stated Nicholas' performance in his mainstreamed academic classes was improving.

The IEP prepared for Nicholas' May 12, 1992 IEP conference demonstrates he continued to progress in his reading and comprehension skills. His SAT–HI scores had improved from the previous year in all but the

---

4. Bayless, who holds a masters degree in deaf education, is a deaf educator for Educational Service Unit #9, which provides special education services, including deaf education services, to the defendant.

5. Dr. Schick cited Dr. Leutke–Stahlman's research to indicate that some SEE–II interpreters err as much 49% of the time while practiced SEE–II interpreters err, on average, approximately 20% of the time.

Word Study Skills section.[6] Another IEP conference was held for Nicholas on May 18, 1993. The IEP prepared for that conference indicated he would continue progressing through school and would be promoted to seventh grade for the 1993–94 school year. His SAT–HI scores improved in all but two categories: vocabulary, where his scaled score was identical to the previous year, and math applications, where his score dropped.

The IEP prepared for Alex Petersen's May 15, 1991 IEP conference demonstrates that as a kindergarten student, Alex's vocabulary was improving, and he was beginning to understand that "written words have meaning." A January 23, 1992 update stated Alex was progressing well in first grade, reading on his own grade level. He was also on grade level in mathematics.

The IEP prepared for Alex's May 12, 1992 IEP conference demonstrates he had improved his word comprehension, language and communicative skills from the previous year. Alex's May 4, 1993 IEP demonstrates his continued improvement in the classroom, including expressive language, spelling and vocabulary words. Testimony presented at trial indicated Alex is currently reading at one level below his grade level.

The IEP prepared for Kendra Janssen's September 30, 1991 IEP conference demonstrates that as a kindergarten student, Kendra had a "good foundation of vocabulary words" and was working on pre-reading skills. Her speech and language skills had expanded between a prior evaluation and the IEP conference.

The IEP prepared for Kendra's August 28, 1992 IEP conference demonstrates she had shown strong improvement on a standardized vocabulary test given in May 1991 at the Boys Town National Research Hospital (BTNRH). A number of evaluations made over time at BTNRH demonstrate that Kendra was showing good progress in her language skills. Testimony during the trial indicated Kendra is currently reading at grade level. She had improved her word comprehension, language and communicative skills from the previous year.

## CONCLUSIONS OF LAW

### Individuals with Disabilities Education Act

■ The IDEA (formerly the Education for the Handicapped Act) provides federal money to state and local agencies for the education of persons with disabilities to ensure they are given

> a free appropriate public education which emphasizes special education and related services designed to meet their unique needs, to assure that the rights of handicapped children and their parents or guardians are protected, to assist States and localities to provide for the education of all handicapped children, and to assess and assure the effectiveness of efforts to educate handicapped children.

20 U.S.C. § 1400(c).[7]

The Act requires states and localities to determine the educational needs of each stu-

---

6. Further, the scaled score sheet indicates the previous test had used "visual phonics" while the 1992 test used no visual phonics.

7. In their trial brief, plaintiffs state that the Nebraska Supreme Court adopted the *Rowley* standard for the Nebraska Special Education Act. (P. Br. at 11, citing, *Adams Central School District v. Deist*, 215 Neb. 284, 338 N.W.2d 591, cert. denied, 464 U.S. 893, 104 S.Ct. 239, 78 L.Ed.2d 230 (1983) (*Deist II*). That opinion supplemented a prior opinion which was decided prior to *Rowley*. *Adams Central School District v. Deist*, 214 Neb. 307, 334 N.W.2d 775 (1983) (*Deist I*). In *Deist I*, the plaintiffs brought claims under the Nebraska Special Education act and the predecessor to the IDEA, the Education for All Handicapped Children Act. The Nebraska Supreme Court discussed the federal Act and did not dis-

cuss the state claim separately, other than to note some textual similarities between the two acts. It applied the federal standard enunciated in *Springdale School Dist. # 50 v. Grace*, 656 F.2d 300 (8th Cir. 1981), to both the state and federal claims.

After *Rowley* was decided, the Nebraska Supreme Court, on its own motion, handed down a supplemental decision, noting that *Rowley* had vacated *Grace*. *Deist II*, 215 Neb. at 285, 338 N.W.2d 591. Again, the court did not discuss the federal and state claims separately; it applied the *Rowley* standard to the action by ordering that the statements in *Deist I* referring to the *Grace* standard be deleted and replaced by quotations from *Rowley*. The court did not explicitly state that the state act applied the *Rowley* standard, but the lack of an independent discussion of the

dent with a disability through the preparation of an individualized educational program (IEP). 20 U.S.C. § 1414(a)(5). The IEP is prepared at a conference including the student's parents or guardians, a representative of the local educational agency, and, when appropriate, the child. The IEP consists of a written document containing:

(A) a statement of the present levels of educational performance of such child, (B) a statement of annual goals, including short-term instructional objectives, (C) a statement of the specific educational services to be provided to such child, and the extent to which such child will be able to participate in regular educational programs, (D) the projected date for initiation and anticipated duration of such services, and (E) appropriate objective criteria and evaluation procedures and schedules for determining, on at least an annual basis, whether instructional objectives are being achieved.

20 U.S.C. § 1401(a)(19).

The Act provides for an appeals process also. Parents or guardians of a disabled student are given "an opportunity to present complaints with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child." 20 U.S.C. § 1415(b)(1)(E). The complaints are resolved at "an impartial due process hearing" with an allowance for appeals of the decision to federal district court. 20 U.S.C. § 1415(e)(4)(A).

In *Board of Education v. Rowley*, 458 U.S. 176, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982), the Supreme Court discussed the scope of review for such appeals, setting forth a two-pronged inquiry: "First, has the State complied with the procedures set forth in the Act? And second, is the individualized edu-

---

state claim implies a strong likelihood that the court intended to apply a consistent standard for the state and federal claims.

The court again was faced with a case raising claims under the state and federal statute in *Williams v. Gering Pub. Schools*, 236 Neb. 722, 463 N.W.2d 799 (1990). In *Williams*, the court stated,

The education of handicapped children is governed by both federal and state legislation. As this court noted in [*Deist I* and *Deist II*, the Education for All Handicapped Children Act of 1975, 20 U.S.C. §§ 1401 *et seq.* (1976), now the Education of the Handicapped Act, 20 U.S.C. §§ 1400 *et seq.* (1988) represents the federal body of law. The care and education of handicapped children are also provided for at the state level pursuant to the Special Education Act, *Neb.Rev.Stat.* Sections 79–3301 *et seq.* (Reissue 1987).

*Id.* at 730, 463 N.W.2d 799. After setting out the federal statute and describing the standard stated in *Rowley*, the court stated, "We adopted this standard in the supplemental opinion in [*Deist II*]." *Id.* at 731, 463 N.W.2d 799. Thus, I conclude the Nebraska Supreme Court has determined the standard to be applied for the Nebraska Special Education Act is identical to that used by the IDEA. As was the case with the Nebraska Supreme Court in *Deist II* and *Williams*, my discussion of the federal statute will apply with equal force to the state claim.

As a final point on this matter, I reject the following contention in plaintiffs' trial brief. Plaintiffs state:

The Nebraska Supreme Court embraced the *Rowley* standard in *Adams Central School District v. Deist*, 215 Neb. 284, 338 N.W.2d 591 (1983) [*Deist II*]. The Supreme Court went on to note that:

The specific requirements in each given case, when determining what is appropriate, will, of course, depend upon the needs and abilities of each individual involved. This standard would require that each handicapped child be given the opportunity to achieve his full potential commensurate with the opportunity provided to other children.

*Id.*, at 314, 338 N.W.2d 591, citing *Springdale School District # 50 v. Grace*, 656 F.2d 300 (8th Cir.1981).

P. TBr. at 11–12. Although the brief began speaking about *Deist II*, the "*Id.* [214 Neb.], at 314 [334 N.W.2d 775]" cite is not found in the text of *Deist II*; the reference must be to the *Deist I* decision. The court did not make that full quotation in *Deist II*. However, the court did make the following statement,

We further modify that opinion [*Deist I*] by *deleting* [214 Neb.] at 315, 334 N.W.2d at 781, the following: " ' 'This standard would require that each handicapped child be given the opportunity to achieve his full potential commensurate with the opportunity provided to other children.'' ' *Springdale School Dist. # 50 v. Grace*, 656 F.2d 300, 304 (8th Cir.1981)," and *substituting* therefor the following: [a quote from *Rowley*].

*Deist II*, 215 Neb. at 286, 338 N.W.2d 591 (emphasis added).

Plaintiffs were apparently quoting *Deist I* for their proposition. Obviously, the opinion in *Deist II* demonstrates the reference to *Grace*, which was vacated by *Rowley*, and the particular quotation in plaintiffs' brief is not an accurate statement of the current law in Nebraska.

cational program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits?" *Id.* at 206–07, 102 S.Ct. at 3051. Plaintiffs do not challenge the compliance with the Act's procedures. Their challenge concerns the second prong; specifically, they claim the defendant's choice of a modified SEE–II signing system rather than a strict SEE–II is not "reasonably calculated" to enable the minor plaintiffs to "receive educational benefits."

In his final orders in the three cases giving rise to this action, the due process hearing officer held that the various signing systems should be considered teaching "methodologies." He then quoted *Rowley* as follows:

> In assuring that the requirements of the Act have been met, courts must be careful to avoid imposing their view of preferable educational methods upon the States. The primary responsibility for formulating the education to be accorded a handicapped child, and for choosing the educational method most suitable to the child's needs, was left by the Act to state and local educational agencies in cooperation with the parents or guardian of the child ... Therefore, once a Court determines that the requirements of the Act have been met, questions of methodology are for resolution by the states.

*Id.* at 207–08, 102 S.Ct. at 3051.

Plaintiffs allege the hearing officer was incorrect in terming the signing system a "methodology." They claim that a signing-system is not a methodology, but rather it is no more than a language, just as English is a language and not a methodology.[8] Therefore, the argument proceeds, the Supreme Court's admonition regarding methodology does not prevent this court from making a determination that strict SEE–II should be used in educating plaintiffs.

Plaintiffs' argument is well taken. Although some courts have viewed signing-systems as methodologies for purposes of the Act, *see, e.g., Lachman v. Illinois State Board of Education,* 852 F.2d 290, 293 (7th Cir.), *cert. denied,* 488 U.S. 925, 109 S.Ct. 308, 102 L.Ed.2d 327 (1988), *Visco v. School Dist. of Pittsburgh,* 684 F.Supp. 1310, 1313 (W.D.Pa.1988), none has discussed the label at any length. Donna Black–Jacupke, the Director of Special Services for defendant school district and a witness with a great deal of educational background and experience, was unable, during questioning by the court, to make an unqualified statement that a signing system or a language is part of teaching methodology. In fact, she stated that she is aware of no "methods" class which considers language a teaching methodology.[9]

The question of whether a signing system is part of any teaching methodology will not be answered definitively by this court. That question, as well as the issue of the proper role of an interpreter to which the parties repeatedly returned, is part of a greater philosophical debate whose resolution will not be hastened by this opinion. As stated by Judge Rosenberg of the Western District of Pennsylvania considering whether a "total communication" is preferable to the "oral-aural" method of teaching hearing-impaired students:

> It should be mentioned at this point that it is *not* for this court to choose between two competing schools of thought in educating the hearing-impaired. Philosophical debates concerning the best method of educating the hearing-impaired are best left to educators who consider this problem their metier.

*Visco v. School Dist. of Pittsburgh,* 684 F.Supp. at 1313 (emphasis in original). In this action the question need not be resolved, because even if the plaintiffs are correct in their argument and the signing system is not

---

**8.** In the due process hearing, plaintiffs attempted to utilize the "native language" requirements of 20 U.S.C. § 1401(a)(21) and its implementing regulations in 34 C.F.R. § 309.9. Plaintiffs disavowed reliance on that section during the trial.

**9.** Rather, she indicated that in her training in education, which included a masters degree in

learning disabilities and endorsements in special and elementary education, mental retardation and educational administration, the common understanding of the term "methods" in education circles refers to the techniques used in teaching (e.g. lectures vs. role play vs. demonstrations, etc.) not the language employed.

a "methodology," they cannot prevail on their IDEA claim.

The scope of review in this action is narrow. If the educational program "developed by the state is designed to enable the handicapped child to receive educational benefits, the courts can require no more. The purposes of the [IDEA] is to 'open the door of public education' to handicapped children, not to educate a handicapped child to his or her highest potential." *Board of Education v. Illinois State Board of Education,* 938 F.2d 712, 715 (7th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 957, 117 L.Ed.2d 124 (1992), quoting *Rowley, supra,* 458 U.S. at 192, 102 S.Ct. at 3043. The Act "does not require states to make available the best possible option." *Mark A. v. Grant Wood Area Education Agency,* 795 F.2d 52, 54 (8th Cir.1986), *cert. denied,* 480 U.S. 936, 107 S.Ct. 1579, 94 L.Ed.2d 769 (1987), quoting *Springdale School District v. Grace,* 693 F.2d 41, 41 (8th Cir.1982), *cert. denied,* 461 U.S. 927, 103 S.Ct. 2086, 77 L.Ed.2d 298 (1983).

■ Defendant has satisfied the Act's requirements for each of the minor plaintiffs. The signing-system implemented by the school district has proved adequate in conferring an educational benefit on each of the children. Each has shown continued academic and lingual improvement through their educational experience. To the extent that any signing system has the potential of enhancing their skills, the modified SEE–II system employed by the defendant must be given due credit. The modifications were completed after consultation with educators knowledgeable in the field of signing systems in similar settings; the modifications to the SEE–II system appear to be specifically designed to utilize the strengths of the unmodified system, yet alleviate some difficulties which are recognized to exist with the system, especially for young students just learning a language.

Plaintiffs have essentially three complaints about their education: (1) allowing an interpreter to change the words translated to the student results in the student receiving education from someone other than the teacher; (2) a strict SEE–II signing system would be more effective than the modified system implemented by defendant; and (3) the interpreters implementing defendant's policies are in fact failing to do so properly. None of these arguments alters the outcome of the IDEA claim.

■ Regarding plaintiffs' first contention, plaintiffs' expert witness acknowledged that even in a strict SEE–II system, the interpreter must do more than transliterate; if the student is not understanding the signs, the interpreter must use different signs, although still signs recognized by the SEE–II system, at or slightly above the student's language level. This action by the interpreter is largely acceptable regardless of which signing system is used. Thus, implementation of the system preferred by plaintiffs would not eliminate the perceived problem, though it might reduce it.

■ Regarding plaintiffs' second contention, the requests of a parent will not, under IDEA, overcome the decision of a school district regarding which signing system is appropriate, given that the school's system otherwise complies with the act. In *Lachman v. Illinois State Board of Education, supra,* the court considered a claim by parents of a deaf child that the school district should be required to use a "cued speech" system rather than a "total communication" system to teach the child. The court held that parents have no power under the Act to compel a school district to choose one such system over another. *Id.,* 852 F.2d at 297. *Accord, Roland M. v. Concord School Comm.,* 910 F.2d 983, 993 (1st Cir.1990), *cert. denied,* 499 U.S. 912, 111 S.Ct. 1122, 113 L.Ed.2d 230 (1991) (issue is whether school district's IEP struck an adequate and appropriate balance, not whether better or worse program existed); *Gregory K. v. Longview School Dist.,* 811 F.2d 1307, 1314 (9th Cir. 1987) (appropriate placement proposed by school district must be upheld even if a family prefers another alternative). Similarly, in this action, IDEA does not require defendant to choose plaintiffs' preferred signing system over a system which otherwise complies with the Act.

■ From the evidence before the court, it appears that the most serious contention of

plaintiffs is the failure of the interpreters to adequately and accurately carry out their interpreting duties. Even though the state hearing officer explicitly limited the issue at hand to whether defendant's policy complied with the Act, plaintiffs presented a great deal of testimony evincing unhappiness with the way the interpreters signed to the students. The testimony of plaintiffs' expert witness, Dr. Leutke–Stahlman, is a good example of this observation. She stated the defendant's written policy varied little from strict SEE–II. However, she concluded the signing system actually used by defendant's interpreters was Pidgin Signed English. Her opinion was based upon a video-tape of interpreters performing in the school. While poor interpreting is disturbing, it does not dictate that the court find a violation of the Act, for as noted by Dr. Leutke–Stahlman, that problem can be present irrespective of the signing system utilized.

Dr. Schick stated that SEE–II is a very difficult signing system to use. Even very practiced interpreters have difficulties using the system, and frequently give improper signs. Some interpreters are able to use proper signs only roughly half of the time. It appears defendant is taking steps to remedy some of the problems by contracting with a state agency which employs interpreters. Hopefully, the interpreters contracted through this agency will bring more harmony to the parties in this situation.

In any event, the issue here is whether the IEP is sufficient for each child to gain "some benefit" from the educational services provided by defendant. *Rowley, supra.* Utilizing that test, the defendant's policy withstands each of the plaintiffs' challenges. The Supreme Court indicated that "the intent of the act was more to open the door of public education to handicapped children on appropriate terms than to guarantee any particular

level of education once inside." *Board of Education v. Rowley,* 458 U.S. at 192, 102 S.Ct. at 3043. Defendant has provided "personalized instruction with sufficient support services to permit the child[ren] to benefit educationally from that instruction." *Id.* at 203, 102 S.Ct. at 3049. Therefore, defendant has provided plaintiffs with a "free appropriate public education" as required by IDEA.

### Americans With Disabilities Act

The Americans with Disabilities Act of 1990 provides in relevant part:

> no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132.[10]

The regulations implementing the ADA provide:

> (1) A public entity shall furnish appropriate auxiliary aids and services where necessary to afford an individual with a disability *an equal opportunity to participate in, and enjoy the benefits of,* a service, program or activity conducted by a public entity.
>
> (2) In determining what type of auxiliary aid and service is necessary, a public entity shall give primary consideration to the requests of the individual with disabilities.

28 C.F.R. § 35.160(b) (emphasis added). "Auxiliary aids" are defined to include "qualified interpreters," which, in turn, is defined as:

> an interpreter who is able to interpret effectively, accurately, and impartially,

---

**10.** The regulations explain that use of the term "disability" instead of "handicap" represents an effort to use currently acceptable terminology:

> As with racial and ethnic epithets, the choice of terms to apply to a person with a disability is overlaid with stereotypes, patronizing attitudes, and other emotional connotations. Many individuals with disabilities, and organizations representing such individuals, object to the use of such terms as "handicapped person"

or "the handicapped." ... In enacting the Americans with Disabilities Act, Congress concluded that it was important for the current legislation to use terminology most in line with the sensibilities of most Americans with disabilities. No change in definition or substance is intended nor should one be attributed to this change in phraseology.

28 C.F.R. Pt. 35 App. A at 432.

both receptively and expressively, using any necessary specialized vocabulary.

28 C.F.R. § 34.104.

Plaintiffs allege the regulations require defendant to allow plaintiffs' chosen sign language, strict SEE–II, to be used at school. Implicit in such a claim is the assumption that "auxiliary aids and services" includes the use of a particular sign language by the interpreter. The express language of the statute and its regulations do not compel such a conclusion. While the regulation includes "qualified interpreters" in the definition of "auxiliary aids," it says nothing about the use of a particular sign language.[11] Further, given the nature of the devices listed in the definition of "auxiliary aids," the regulation may concern only general categories of devices rather than particular means of providing assistance. However, because defendant does not challenge plaintiffs' interpretation of this regulation,[12] and the plaintiffs' interpretation is not unreasonable, I shall assume the definition of "auxiliary aids" includes the use of a specific signing system.[13]

■ Despite that conclusion, defendant is not necessarily bound to accept plaintiffs' choice of SEE–II for use at school:

> The public entity must provide an opportunity for individuals with disabilities to request the auxiliary aids and services of their choice. This expressed choice shall be given primary consideration by the public entity.... The public entity shall honor the choice *unless it can demonstrate that another effective means of communication exists* ....

28 C.F.R. Pt. 35.160, App. A at 451 (emphasis added). Thus, defendant has the burden of demonstrating the modified SEE–II system is an "effective means of communication."

■ The evidence presented at the administrative hearing, as well as during the trial, clearly demonstrates that the modified SEE–II system employed by defendant is an effective means of communication. As discussed with the IDEA claim, *supra,* the minor plaintiffs have continued to progress through the school grades and appear to be improving in their class work. The modified signing system is designed to perform essentially the same function as the strict SEE–II system: to portray the meaning, syntax and word order of the teacher's speech through a medium accessible to a hearing-impaired student. The system is based in a recognized signing system, SEE–II, and uses some modifications which draw from other accepted systems, such as ASL and PSE. Although eclectic, the system utilizes, and attempts to harmonize, what seem to be appropriate tenets of widely used systems in such a way as to assist in the educational development of young children taught at home in an English-based system. Defendant has demonstrated its modified SEE–II system is an effective means of communication as required by the ADA's regulations.

The Act and its regulations contain no further explicit textual requirements. However, I am hesitant to conclude that no more is required of defendant than to provide a merely "effective" auxiliary aid when plaintiffs have requested another method. One must keep in mind the overriding purpose of the ADA: to prohibit discrimination against disabled persons. 42 U.S.C. § 12132. If only an "effective" auxiliary aid is needed when a requested aid is vastly superior to the

---

11. The regulations define "auxiliary aids and services" to include:

> (1) Qualified interpreters, note-takers, transcription services, written materials, telephone handset amplificaters, assistive listening devices, assistive listening systems, telephones compatible with hearing aids, closed captioning, telecommunications devices for deaf persons (TDD's), videotext displays, or other effective methods of making aurally delivered materials available to individuals with hearing impairments ...

> 28 C.F.R. § 35.104.

12. Neither plaintiffs nor defendant has cited, and the court has not discovered, any cases requiring this type of interpretation of the "auxiliary aids" language of the ADA regulations or the regulations promulgated for the Rehabilitation Act, see 28 C.F.R. 39.103, from which the ADA's regulations were developed. See 28 C.F.R. pt. 35.104 App. A at 431.

13. This conclusion is bolstered by the regulation's definition of "qualified interpreter" which requires the interpreter use "any necessary specialized vocabulary" and to "effectively" convey the message to the hearing-impaired recipient.

school district, the principal purpose of the act may be circumvented; the person with a disability may be relegated to a lesser service for what may prove to be no rational justification. To truly end discrimination against persons with disabilities, some type of *equally* effective means of communication must be provided if the disabled person's choice of auxiliary aid is denied.

Returning to the language of the statute, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132. Thus the ultimate purpose is to protect against discrimination or exclusion based on the individual's disability. This purpose is much like that of Title VII, 42 U.S.C. § 2000e *et seq.* The Supreme Court has stated the purpose of Title VII is to ensure fair and non-discriminatory employment decisions be made in an arena where numerous and varied considerations may weigh on those decisions. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 801, 93 S.Ct. 1817, 1823, 36 L.Ed.2d 668 (1973); *see also, Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Because of the vast number of reasons which may impact such a decision, proving that a discriminatory reason was involved is extremely difficult. Confronting the obvious proof problems, the Supreme Court employed a three part burden-shifting process, leaving the ultimate burden of persuasion on the plaintiff.[14]

Plaintiffs' ADA claim raises a problem similar to that of a Title VII claim: what proof of discrimination must be demonstrated in a setting where a discriminatory reason may be hidden by non-discriminatory factors. The ADA regulations provide for a framework requiring defendant to demonstrate that an alternative effective means of communication is being used. Once that point is reached however, plaintiffs must be given the opportunity, as in a Title VII action, to rebut defendant's position—that is, to demonstrate discrimination. Because of the language of the regulation and the meaning of the Act, once defendant has carried the burden of demonstrating an effective means of communication is being used, plaintiffs must carry a burden of demonstrating the defendant's chosen auxiliary aid is not *equally* effective as plaintiffs' chosen aid.

In this action, plaintiffs have failed to carry that burden. Although plaintiffs presented persuasive evidence that SEE–II is an effective method of teaching hearing-impaired students the syntax and word order of the English language and that it does so more effectively than other languages such as PSE and ASL, they failed to present evidence demonstrating SEE–II is as effective as the system described in defendant's policies. Dr. Leutke–Stahlman described, at length, the promising characteristics of strict SEE–II and how it could assist in the English developmental skills of hearing-im-

---

**14.** As described by the Eighth Circuit Court of Appeals:

Under the first stage of the McDonnell Douglas–Burdine framework, the plaintiff has the burden of production to establish a prima facie case of discrimination.

\* \* \* \* \* \* \*

A plaintiff who establishes a prima facie case "in effect creates a presumption that the employer unlawfully discriminated against the employee," ... and the analysis reaches the second stage of the McDonnell Douglas–Burdine framework. In the second stage, the burden of production "shifts to the defendant 'to articulate some legitimate nondiscriminatory reason for the employee's rejection.'"

\* \* \* \* \* \*

A defendant who articulates a legitimate, nondiscriminatory reason overcomes the pre-sumption of discrimination raised by the prima facie case ... and the case must them proceed to the third stage of analysis. At the third stage, the plaintiff must demonstrate that the defendant's proffered reason is mere pretext, "either directly, by persuading the court that a discriminatory reason more likely than not motivated the employer, or indirectly, by showing that the employer's proffered explanation is unworthy of credence."

*Hase v. Missouri Division of Employment Security,* 972 F.2d 893, 896 (8th Cir.1992) (citations omitted).

paired students better than other languages. However, she did not appear to be sufficiently conversant with the eclectic system used by defendant to state SEE–II's relationship to that system. Describing the modifications listed by the policy, Dr. Leutke–Stahlman identified few actual modifications to SEE–II and was unable to determine the meaning or impact of some of the remaining items on the list. She admitted to having little knowledge of the school's signing system other than viewing some video-tapes of interpreters who did not appear to be properly using the system described in the policy.

The policies describing defendant's signing system portray a system employing SEE–II for the majority of the time while adding some elements of other languages. The eclectic system appears to be tailored to difficulties inherent in what is essentially learning two languages at one time. When new words are used, the interpreter uses the new sign for the new word but also gives meaning to that word by giving signs which the student already understands. When a word has multiple meanings, the interpreter signs the word, but also places a context around the word by giving other signs more precisely describing its particular meaning in that instance. These modifications, and the others listed in defendant's policies, seem appropriate to assist the language acquisition of hearing-impaired students, who face substantial obstacles to achieving language proficiency regardless of the signing system used.

It is true that the modifications treat hearing-impaired students differently from hearing students. While other students learn directly from the words of the teacher and may personally raise questions when they do not understand new or multiple definitional words, hearing-impaired students using defendant's signing system are given an interpreter who may explain the words using language different from and less sophisticated than that used by the teacher. However, I cannot conclude that this differing treatment is discriminatory.

As stated by Donna Black–Jacupke, the goal of educators should be to help students learn in any way possible. If "lowering" the level of signing to just above the student's normal conversational level is occasionally necessary to effectively communicate the teacher's message, such action by the interpreter probably gives the student an educational benefit more quickly and efficiently than requiring the student to convey a question through the interpreter to the teacher about the new word or idea. Significantly, however, the student has no way to know whether the teacher actually used the word that was signed, or a new word that the student should be attempting to learn, and the interpreter might not accurately identify the student's "normal conversational level." Perhaps little is lost if the practice occurs only occasionally. But if used frequently, the practice could become a serious educational detriment by keeping the student at a level of communications skills lower than that used by the teacher to communicate with hearing students.

In this case, though, such a theoretical possibility has not been shown to exist in fact. The evidence does not demonstrate that these plaintiffs must endure the use of a less-than-equally-effective signing system to that which they have requested. Although the plaintiffs' expert witness testified that it was generally her opinion that the SEE–II system facilitates development of English language skills more efficiently than do other signing systems, the studies supporting that opinion are less than conclusive, especially regarding defendant's eclectic system. Further complicating this matter is the fact that plaintiffs use the SEE–II system in their homes. It is difficult, indeed, to determine whether plaintiffs' present levels of reading and language skills are reflective of that use in the home, or alternatively, of the use of the modified SEE–II system at school. In sum, the evidence is insufficient to demonstrate that the effect of the defendant's system is not equal to that of SEE–II. Thus, plaintiffs have failed to demonstrate discriminatory effect. I therefore conclude that the ADA claim must fail.

## CONCLUSION

Plaintiffs have failed to prove by a preponderance of the evidence that defendant violated the Individuals with Disabilities Edu-

cation Act, the Nebraska Special Education Act, or the Americans with Disabilities Act by using a modified SEE–II signing system rather than a strict SEE–II system. I shall order judgment for the defendant on these claims.