Theriault v. NH Dept. of Safety       CV-96-544-M    01/21/98

UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE


Dennis Theriault,
      Plaintiff

      v.                                    Civil No. 96-544-M

Richard M. Flynn, Commissioner,
New Hampshire Dept. of Safety,
      Defendant


**O R D E R**


Dennis Theriault brings this civil action against Richard Flynn, Commissioner of the New Hampshire Department of Safety, seeking declaratory and injunctive relief under the Americans with Disabilities Act, 42 U.S.C. § 12101, et seq. (the "ADA"). Theriault suffers from cerebral palsy, a condition which manifests itself as involuntary and exaggerated movements in his limbs, trunk, and face. He claims that defendant (through one of his agents) violated the ADA by requiring him to take a road performance test before renewing his driver's license. Plaintiff describes his ADA claim as follows:

> By requiring plaintiff to perform a road test as a precondition for renewal of his license solely on the basis of his obvious disability, and without any substantiated information that he posed a particular risk to public safety, the defendant [relied] on stereotypical assumptions to protect the public safety, rather than reliable indicators, and [] thus discriminat[ed] against plaintiff in violation of the ADA.

Complaint, ¶ 27.

Defendant denied any wrongdoing and moved to dismiss the complaint, claiming that plaintiff failed to allege a cognizable claim under the ADA. Plaintiff objected. Because both parties submitted and relied upon materials which are outside of the complaint, the court converted defendant's motion to dismiss to a motion for summary judgment. Theriault v. Flynn, No. 96-544-M, slip op. (November 21, 1997 D.N.H.). In accordance with Fed. R. Civ. P. 12(b), the court then afforded the parties the opportunity to "present all material made pertinent to such a motion by Rule 56.". Id. Defendant responded by supplementing his motion with additional legal argument, as well as affidavit and deposition testimony. Plaintiff submitted a cross motion for summary judgment, a supporting memorandum, and affidavits.

**Standard of Review**

Summary judgment is appropriate when the record reveals "no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In ruling upon a party's motion for summary judgment, the court must, "view the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor." Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990).

**Factual Background**

Plaintiff is 29-years old and suffers from cerebral palsy, a disability that diminishes his ability to use his legs, limits fine motor skills with his hands, and causes speech difficulties. He is unable to ambulate without the assistance of a walker. To travel longer distances, plaintiff uses a manual wheelchair or electric scooter. Dr. John B. Moeschler, an expert retained by plaintiff, recently examined plaintiff and made the following observations:

> On examination, Dennis is a healthy 29-year old man who presents in good health. His intelligence is quite normal. His craniofacies is entirely normal. His speech muscles are affected by his cerebral palsy, but Dennis is easily understood by me. He has retention of some of his early automatisms [involuntary muscular movements]. His right side is less affected than his left. He has spasticity of all extremities with evidence of athetosis [slow, involuntary movements of the fingers, toes, hands, and feet]. This presents as alteration of fluid control of movements together with abnormally elevated tone. His deep tendon reflexes are increased. Ankle clonus is present.
>
> It is my opinion that Dennis has rather typical cerebral palsy affecting movements of all parts of his body. He presents as a healthy man with mixed athetoid and spastic quadriplegia with his left side more affected than his right, and his legs more than his arms. Trunk, face and muscles of phonation are also affected by these alterations in tone and posture.

Affidavit of John B. Moeschler, M.D.

In 1987, plaintiff sought and obtained his first driver's license from the State of New Hampshire. To perform the requisite road test, plaintiff drove his own vehicle, which is specially equipped with hand controls. Four years later, he

3

sought to renew his driver's license.  When plaintiff surrendered his expired license, the examiner noticed that it lacked the proper coding to indicate that plaintiff drives with the assistance of special equipment.  Accordingly, the examiner asked plaintiff to perform a road test, so that he might determine which coding should be added to plaintiff's renewal license (as discussed more fully below, renewal licenses are normally issued upon the applicant's satisfactory completion of a visual acuity test; typically, no road test is required).  Plaintiff agreed, successfully completed the road test, and received a renewal license which bore the appropriate coding.

In February of 1995, plaintiff again sought to renew his license.  As he had on prior occasions, he entered the licensing office in his wheelchair.  Because his "ability to write by hand is extremely limited" (due to the spasticity and athetosis of his hands and arms), plaintiff asked his father to complete the paperwork associated with the renewal process.  Plaintiff's affidavit at para. 10.  In light of plaintiff's condition on that day, and because he operates his vehicle with hand controls, the license examiner asked that he demonstrate his ability to safely operate a motor vehicle.  See Deposition of Larry Ashford at 12-13.  Again, plaintiff complied, successfully completed a road test, and demonstrated that he was in fact able to safely operate his specially equipped vehicle.  The license examiner then issued plaintiff a renewal license.

4

**Discussion**

Plaintiff does not (and, in fact, cannot) claim that he has been denied the privilege of obtaining a New Hampshire driver's license because of his disability; on each occasion that he sought a driver's license, he received one. Instead, plaintiff's claim is more narrowly focused. He suggests that because his disability manifests itself as, among other things, involuntary hand movements and a lack of fine motor skills, the ADA forbids defendant from relying upon those facts to require plaintiff to demonstrate an ability to safely operate his hand-controlled motor vehicle. Instead, plaintiff claims that defendant must either: (1) subject all people seeking license renewals to a road performance test; or (2) rely only on other indicators of plaintiff's driving ability, such as his past driving history and safety record (e.g., motor vehicle accidents, traffic citations, etc.).

I. ADA and New Hampshire's Motor Vehicle Licensing Statute.

Title II of the ADA, 42 U.S.C. § 12131, et seq., prohibits public entities from discriminating against individuals with disabilities and provides that:

> Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits or the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

5

42 U.S.C. § 12132.  Defendant concedes that the New Hampshire Department of Safety, Division of Motor Vehicles, is a public entity.  He also agrees that plaintiff is a "qualified individual with a disability," insofar as he: (1) has a disability within the meaning of the ADA; and (2) meets the essential eligibility requirements for the issuance of a driver's license.  However, defendant denies that he violated the ADA by asking plaintiff to demonstrate that he was "otherwise qualified" to posses a driver's license by successfully performing a road test.

In support of his decision to require plaintiff to take a road test, defendant relies upon N.H. Rev. Stat. Ann. ("RSA") ch. 263, which provides:

> **Reexamination.**  The director may require with cause any person holding a license to drive motor vehicles or applying for reissue of such license <u>to pass such examination as to his qualifications as the director shall prescribe</u>.  Such reexamination may include an examination for visual acuity as prescribed by the director.  <u>No license shall be reissued to such person or continued in effect until the director is satisfied as to such person's fitness to drive a motor vehicle</u>.  Every person upon reaching his seventy-fifth birthday shall demonstrate his physical and mental qualifications to hold a license by examination, as prescribed by the director.

RSA 263:7 (emphasis supplied).  The administrative regulations promulgated in conjunction with RSA 263 specifically authorize the director to require certain applicants to satisfactorily complete a road performance test.

6

> An applicant for a renewal driver's license who is less than 75 years of age may be required to complete a road performance evaluation or a physical or mental examination if the director has any reason to believe the applicant may be a hazard to public safety if licensed to drive, such as but not limited to apparent psychological or physical impairment.

Saf-C 1003.27(b).[1]


This statutory and regulatory scheme is consistent with New Hampshire's determination that it is neither necessary nor an effective use of State resources to require all individuals seeking license renewal to perform a road test. Instead, all such applicants must satisfactorily complete an eye examination and only the elderly and those who, in the judgment of the examiner, may pose a hazard to the public are required to perform a road test. Id. See also Affidavit of Alan Rines (Supervisor of Driver Licensing).

---

[1] The applicable regulation which was in effect when plaintiff sought to renew his license was Saf-C 1003.28(a)(2). Although that rule remains essentially unchanged, it was re-enacted as Saf-C 1003.27. The parties have agreed that the amended version of the regulation is substantially similar to its earlier version, and have cited it (rather than the version in effect in 1995) throughout their memoranda.

7

II. Balancing Interests: Public Safety and Freedom from Discrimination

Congress enacted the ADA "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). Consequently, the federal regulations implementing the ADA provide that "[a] public entity may not administer a licensing or certification program in a manner that subjects qualified individuals with disabilities to discrimination on the basis of disability . . .." 28 CFR § 35.130(b)(6).

In striving to eliminate unfair discrimination against the disabled, however, legitimate concerns for public safety and welfare cannot be ignored. See School Board of Nassau County v. Arline, 480 U.S. 273, 287 (1987). Accordingly, "[a]lthough persons with disabilities are generally entitled to the protection of this part, a person who poses a significant risk to others will not be 'qualified,' if reasonable modifications to the public entity's policies, practices, or procedures will not eliminate that risk." 28 CFR pt. 35, App. A at 463.[2]

---

[2] Appendix A to 28 CFR pt. 35 addresses the situation in which a public entity might legitimately preclude a disabled person from participating in the programs or services offered by that entity:

> For [some] activities, identification of the "essential eligibility requirements" may be more complex. Where questions of safety are involved, the principles established in § 36.208 of the Department's regulation implementing Title III of the ADA, to be codified at 28

8

When determining whether an individual poses a threat to the health or safety of others, a public entity must "make an individualized assessment, based on reasonable judgment that relies on current medical knowledge, or on the best available objective evidence." 28 CFR 36.208(c). Such an assessment may not, however, be based upon generalizations or stereotypes. 28 CFR pt. 35, App. A at 463.

III. The Conduct at Issue: Requiring Plaintiff to Perform a Road Test.

Plaintiff claims that defendant violated the ADA by requiring him to take a road test "solely on the basis of his obvious disability." Plaintiff's memorandum at 6. The court disagrees.

Based upon the undisputed facts of record, it is evident that defendant required plaintiff to perform a road test, not simply because he finds himself among that group of persons who suffer from cerebral palsy, but based upon his own manifested symptoms and apparent inability to control his hand movements on the day he sought relicensing, and the fact that he operates his

_____

CFR, part 36, will be applicable. That section implements section 302(b)(3) of the Act, which provides that a public accommodation is not required to permit an individual to participate in or benefit from the goods, services, facilities, privileges, advantages and accommodations of the public accommodation, if that individual poses a direct threat to the health or safety of others.

Id. at pg. 463.

9

automobile with hand controls. That is to say, defendant asked plaintiff to demonstrate his ability to safely operate his motor vehicle because the physical manifestations of his disability (at least on the day in question) reasonably suggested to defendant that, despite his prior ability to drive safely, plaintiff may have no longer been able to do so.

Contrary to plaintiff's claim that there was no "evidence that [his] functional ability to drive safely [had] been impaired," plaintiff's memorandum at 11, plaintiff did exhibit objective signs that he might not be able to safely operate his vehicle. Likewise, plaintiff's argument misses the mark when he suggests that "[t]here is simply no evidence in the record, or in Defendant's own explanation of why a road test was required, to suggest that somehow between the time of his previous two road tests his condition had deteriorated or otherwise significantly changed to make safety a legitimate new concern." Plaintiff's memorandum at 12. First, it is clear that from defendant's perspective, public safety is not a "new" concern. Second, plaintiff fails to account for the fact that the license examiner, unlike the plaintiff, had no way of determining whether or to what degree plaintiff's condition had deteriorated since he last renewed his license.

Plainly, if the license examiner had asked plaintiff to perform a road test merely because he required the assistance of

10

a walker or wheel chair, the circumstances of this case would be quite different. However, plaintiff himself acknowledges that what prompted the examiner's request was plaintiff's involuntary hand movements (to the point that he could not complete the required paper work) and the fact that he actually controls his motor vehicle exclusively with his hands.

Even viewing plaintiff's allegations in the light most favorable to him, it is plain that defendant's actions were not motivated by unlawful generalizations or stereotypes regarding the disabled. Instead, they were based upon a reasonable, legitimate, permissible and, indeed, responsible concern for public safety. Thus, even assuming that plaintiff has articulated a prima facie case of unlawful discrimination, defendant has advanced a legitimate and non-discriminatory basis for his decision to require plaintiff to perform a road test. In response, plaintiff has failed to produce any evidence that would reasonably support a finding of discriminatory animus on defendant's part.[3]

---

[3] Although numerous courts have held that the McDonnell Douglas burden-shifting framework applies in the context of a claim under Title I of the ADA, the court of appeals for this circuit has yet to consider whether that paradigm applies in the context of a claim under Title II (which adopts the enforcement provisions of the Rehabilitation Act). Nevertheless, several courts have considered this issue and concluded that the burden-shifting framework does apply in Title II actions where the public entity denies any discriminatory animus as the basis for its allegedly wrongful conduct. See, e.g., Petersen v. Hastings Public Schools, 831 F.Supp. 742, 753 (D.Neb. 1993), aff'd 31 F.3d 705 (8th Cir. 1994).

In an unpublished decision, the United States District Court for the Western District of Texas addressed a similar situation, in which the state board of law examiners conducted a limited inquiry into the mental health history of applicants seeking to practice law in the State of Texas. The court's observations in that case, while not controlling, are helpful in putting this case in proper perspective:

> The plaintiffs, seeking to vindicate the rights of the mentally disabled, fail to account for the awesome responsibility with which the Board is charged. The Board has a duty not just to the applicants, but also to the Bar and the citizens of Texas to make every effort to ensure that those individuals licensed to practice in Texas have good moral character and present fitness to practice law and will not present a potential danger to the individuals they will represent.

Applicants v. Texas State Board of Law Examiners, No. 93-CA-740, 1994 WL 923404, at *8 (W.D.Tex. October 11, 1994). Similarly, defendant in this case is statutorily obligated to ensure that individuals licensed by the State to operate motor vehicles have, among other things, the physical ability to do so safely. The safety of all drivers, passengers, and pedestrians depend upon the director's carrying out that obligation responsibly and with seriousness of purpose.

---

To the extent that the McDonnell Douglas framework applies in this case, defendant has met his obligation of articulating a legitimate and non-discriminatory basis for his conduct. Plaintiff must then respond with evidence sufficient to demonstrate, at a minimum, that there is a genuine issue of material fact with regard to his ultimate burden of proof. He has failed to do so.

12

Here, the driving test plaintiff was required to perform was minimally intrusive and specifically tailored to determine whether, in light of his obvious inability to control his hand movements, he could nonetheless safely operate his specially equipped, hand-controlled vehicle. Subjecting plaintiff to such a limited and minimally intrusive test was perfectly reasonable and did not violate the provisions of the ADA. To the contrary, because the individualized inquiry into plaintiff's driving ability was prompted by reasonable judgment and objective evidence suggesting he might have had difficulty safely operating a motor vehicle, the director's action was entirely consistent with the ADA, New Hampshire law, and his responsibility to ensure public safety.

## Conclusion

The ADA requires public entities to provide the disabled with meaningful opportunities to participate in the services or programs offered by those entities. Where questions of public safety are involved, however, a public entity may employ reasonable tests or establish tailored prerequisites to participation, provided such tests and prerequisites are based upon objective and reasonable criteria, rather than prejudice, irrational fear, or baseless stereotyping. In this case, despite plaintiff's conclusory assertions to the contrary, defendant did not violate the ADA when he required plaintiff to perform a brief

13

road test sufficient to demonstrate his ability to safely operate a motor vehicle on the public roadways.

While reviewing the driving records of applicants for license renewal may well be an appropriate means by which to screen out individuals with documented histories of unsafe driving, it is by no means the exclusive way to protect the public from poor drivers.  And, of course the approach advocated by plaintiff is hopelessly limited — it would serve only to keep those who have already demonstrated a threat to the public safety from obtaining licenses.  It would do nothing to prevent future accidents or injuries resulting from relicensing people who, based upon objective and neutral criteria, demonstrate a present potential inability to safely operate a motor vehicle.

In the end, defendant would be derelict in performing his duties, and the public would be exposed to unnecessary and substantial risk, if he did not inquire into every applicant's ability to safely operate a motor vehicle when, based upon reasonable, neutral, and objective criteria, it appears that the applicant may, if licensed to drive a motor vehicle, pose a substantial danger to the public.

For the foregoing reasons, the court concludes, based upon the undisputed material facts of record, that defendant is entitled to judgment as a matter of law.  Accordingly,

defendant's motion for summary judgment (document no. 8) is granted. Plaintiff's motion for summary judgment (document no. 17) is denied. The Clerk of the Court is instructed to close the case.

**SO ORDERED.**

_____
Steven J. McAuliffe
United States District Judge

January 21, 1998

cc: Stephen J. Judge, Esq.
Ronald K. Lospennato, Esq.